# Richmond

MONTGOMERY WARD & COMPANY v. O. L. NANCE.

November 14, 1935.

Present, All the Justices.

364

The opinion states the case.

*Funkhouser, Apperson, Rush & Gentry,* for the plaintiff in error.

*Dillard & Dillard,* for the defendant in error.

CHINN, J., delivered the opinion of the court.

This is an action for slander and libel brought by O. L. Nance against Montgomery Ward & Company. There was a verdict and judgment for the plaintiff in the sum of $5,000, and this judgment is now before us for review.

Montgomery Ward & Company conducts a retail store in the city of Roanoke, Virginia, which is one of one hundred and six stores in what is termed the New York region, or Region No. 1. At the time the events occurred out of which this suit arose, O. L. Nance had been employed for nearly two years by the defendant below in the capacity of manager of the men's and boy's clothing and underwear department in the Roanoke store. C. E. Parker occupied the superior position of store manager. A. M. Derwart was district supervisor of eleven stores in the New York region, including the store at Roanoke; and E. C. Rowe was regional manager of the 106 stores in that region.

The evidence shows little substantial conflict, but resolving, as we must, all existing conflicts in plaintiff's favor, the facts may be stated as follows:

About the first of the year, 1933, Mr. Parker, manager of the store, received instructions from his superiors in the organization to reduce his force as much as possible, and to lay off such employees as were retained for two days out of each week. Parker felt that to carry out this plan would seriously interfere with the successful operation of the store, so he called his employees together in sections, and proposed that, instead of releasing any one of them and laying any employee off for two days out of a week, they should accept a thirty per cent reduction in salary for the months of January and February and go back on full pay on March 1, 1933; assuring the plaintiff and certain other of the employees that such a plan meant a guarantee of their positions up to January 1, 1934. The plaintiff and other employees interested accepted the plan, and worked full time in January and February at a thirty per cent reduction in salary, and went back on full pay March 1, 1933.

This was the condition of affairs until June 29, 1933, when Parker informed O. L. Nance that he had been instructed to release him and several other employees, but that he would not do so because plaintiff and the others

mentioned had co-operated with him and had helped to make the business go. At that time a man named Gibbons had been sent by the company to the Roanoke store to take Nance's place. Parker informed Nance of that fact and told Nance that from that date he would work under Gibbons in the capacity of salesman and that Gibbons would be manager of his department, and Nance would be relieved of all responsibility of the department, but that Nance would be paid the same salary, and should have his position as long as Parker was manager of the store. Nance agreed to this and worked in the capacity of salesman under Gibbons as manager of the department until July 25, 1933, without any knowledge that any other change was contemplated by the company. When this change was made, Nance, feeling his future position somewhat insecure, asked Parker if he would give him a letter of recommendation. Parker gave him a letter highly recommending him as a "capable clothing man," "strictly honest, and a hard worker, and more than conscientious. He will prove a valuable asset to any organization needing the services of a man of this type."

On July 25, A. M. Derwart, district manager of the company, came to Roanoke, and late in the evening called Nance into his office and asked him if he had heard of the changes which had been scheduled to be made in the store in regard to himself and certain other employees. Nance told him that Parker had told him about it about a month before; whereupon Derwart, according to Nance's testimony, informed the plaintiff that as Parker had refused to carry out the company's instructions the duty had fallen on him and that he was releasing him as of that date with two weeks' salary in advance, which he said was due the plaintiff on account of his services to the company. "He told me he wanted to assure me that it wasn't anything personal, wasn't because my services had not been satisfactory, but due to the company's new set-up that was taking place in all the retail stores." Nance thereupon informed Derwart of the contract of employ-

ment which he made with C. D. Parker early in the year. Parker was called in and stated that he did not remember making such an agreement that would be binding on the company, but even if he did he didn't think Nance could do anything about it. Nance replied that he had made the agreement, that he had worked for three months with a thirty per cent reduction in salary with that understanding, that he had complied with his part of the contract, and expected the company to do the same. Derwart, thereupon, in order to settle with Nance, informed him that instead of two weeks' pay in advance, he would make good to him the thirty per cent reduction for January and February, but would not pay both. Nance refused this offer and Derwart then accused him of wanting to take the matter into court, and told him that if he took it into court it would not cost the company anything as they had their paid attorneys, while he would have to employ an attorney. At this stage of the conversation, Derwart suggested that it was late, and that the plaintiff come back the next morning.

On the night of July 25th after the above conference between Derwart and plaintiff, Derwart called E. C. Rowe, of New York, regional manager of the defendant, over the telephone and informed him that Nance refused to be discharged on account of the contract he claimed to have with Parker, and refused to accept the settlement he (Derwart) had offered him. After further conversation Rowe told Derwart, "If you have made up your mind that this man is inefficient tell him so; be truthful with him and write him a letter telling him that you are discharging him for inefficiency."

On the morning of July 26, Nance came to the store as instructed by Derwart, and Derwart took him over to an eating place where they sat down and talked matters over. Nance explained to Derwart his situation as to his family, finances, etc., and how important his position was to him. Derwart again asked Nance if he would accept the proposition offered him the evening before in regard to the

thirty per cent reduction from the salary of the preceding January and February, and Nance again refused. They then went back to the store.

That afternoon Derwart again approached Nance who was at work about his department in the store, and asked him a number of questions about who had been doing the buying for his department, and called for the "checking sheets," which are defined as a list of staple and seasonable merchandise used as a guide for the replenishment of the stock. Nance explained to Derwart that he did not have the checking sheets and was no longer responsible for them because he had been relieved of that responsibility by Parker thirty days before when he had turned the management of the department over to Gibbons. Derwart procured the checking sheets from Gibbons, and took Nance around the department asking him a number of questions about goods in stock and on display, etc. On account of Derwart's quizzing and attitude, Nance came to the conclusion that Derwart was trying to find some ground upon which to base a complaint against him. He remonstrated with Derwart, and asked him what he was trying to do, whether he was trying to "trap him." Derwart replied that Nance was the hardest man to deal with he had ever seen, and Nance told him that he was not hard to deal with, but Derwart was trying to find fault with him for things for which he was not responsible, and Derwart seemed to become angry. About that time Nance had to wait on a customer, and Derwart went to his office on the second floor of the building.

Derwart then went to the cashier's office and directed Miss Frances Showalter, who was payroll keeper, to come to his office to take some notes of a conversation. She told him that she could not take notes, but could hear what took place. Derwart then sent for Nance and when he arrived at the office he found Derwart and Miss Showalter present. Derwart took up the checking sheets and pointed out various items which were not in stock. Nance again called Mr. Derwart's attention to the fact that he was not

responsible for the failure to buy the merchandise, as his department had not been under his supervision but under that of Gibbons, whereupon Derwart told him that he was responsible for the merchandise not being there, and for that reason "he was releasing me because of inefficiency and because my services had not been satisfactory to the company." Nance replied: "When did you change your mind about why you are releasing me, because yesterday, twenty-four hours before, you told me that you were releasing me for other reasons, which meant directly opposite to these reasons," and asked him what kind of a man he was anyway.

Derwart then told him he had decided to allow him, in addition to the thirty per cent reduction in salary, pay for two weeks in advance. Nance refused to accept this settlement, telling Derwart that he had gone from dollars and cents to a matter of principle, and that no amount of money would interest him as long as it was coupled with what he considered would be a dishonorable discharge. He asked Derwart if he would state in writing why he was releasing him because he told him one thing one day and another the next. Derwart told him that this was not necessary.

Nance then asked Miss Showalter if she would remember and be witness to what Mr. Derwart said, and after Derwart told her she could answer the question, she said, "I remember exactly what he said." Nance then said to Derwart:

"Now you mean by that that I am finally discharged from the company and I should get my hat and coat and go." Derwart said, "Yes."

As Nance started out of the room Derwart again asked him what about the settlement he had offered, and after he had started down the stairway asked Nance whether he owed the company anything. He replied no, and got his hat and coat and left the store.

After Nance had left Derwart dismissed Miss Showalter, and called Miss Lura Jennings, a stenographer employed

in the store, to his office and dictated a letter addressed to the plaintiff, which so far as pertinent reads as follows:

"Dear Mr. Nance:

"This will confirm our conversation of today, at which time I notified you of your release from Montgomery Ward & Company because of inefficiency and services not satisfactory to this company."

This letter was received by Nance by registered mail on the following day. In the afternoon of July 27, 1933, Nance went to Derwart's office and again discussed the entire matter with him. He told Derwart that the first consideration with him was the retraction of the statement that he was discharging him for inefficiency and services unsatisfactory to the company. Derwart then asked Nance, "What else will it take?" Nance replied that he was entitled to be employed to January 1, 1934; if not, then he was entitled to his salary of $22.50 per week for five months, but would accept $225 in full settlement of the salary provided the charge against him was retracted. Derwart after some further conversation stated he had done all he was going to do, and that the matter was finally closed.

Nance's next step was to consult Mr. Morris L. Masinter, an attorney of Roanoke, who, under date of July 28, 1933, wrote A. M. Derwart the following letter:

"Dear Sir:

"Mr. Oscar L. Nance has turned over to me for attention your letter addressed to him of July 26th. In this letter you notified Mr. Nance that you were releasing him because of "inefficiency and services not satisfactory to this company." This position is entirely contrary to the statement you made to Mr. Nance at the time that you notified him that his services would have to be dispensed with because of a change of the set-up in the company's employment in Roanoke and is entirely contrary to the opinion of Mr. G. D. Parker, your manager at Roanoke, who, on June 30, 1933, gave Mr. Nance a general letter of recommendation, a copy of which he hereto attached.

"It appears that your letter of July 26th was written for the purpose of establishing a self-serving declaration in the event of possible action by Mr. Nance against the Montgomery Ward & Company. There is no question in my mind but that Mr. Nance is entitled to recover from your company salary at the rate of $22.50 per week up until January 1, 1934. When Mr. C. D. Parker was acting as your local manager he made a positive and definite agreement with Mr. Nance to employ him up until January, 1934, in consideration of Mr. Nance reducing his salary thirty per cent up to March, 1933. This agreement was made some time during the latter part of the first week of January, 1933, and was not only made with Mr. Nance but with other employees of the company.

"Mr. Nance tells me that he has offered to compromise his claim against the company for $225. In view of the fact that he has made this offer I shall recommend its acceptance, but this amount will be accepted in full settlement of Mr. Nance's claim only upon the consideration that you will retract your statement that Mr. Nance was dismissed from the employment of Montgomery Ward & Company because of inefficiency and services not satisfactory to the company. I wish to warn you further that if this report is sent in to headquarters and makes it impossible for Mr. Nance to obtain future employment, that you and your company will be held strictly accountable for any damages that may accrue to Mr. Nance thereby.

"I will ask that you let me hear from you at once, advising me as to your position in this matter.

"Very truly yours,"

Derwart ignored this letter, whereupon Mr. Masinter wrote Mr. E. C. Rowe, regional manager, enclosing a copy of the letter of July 28th, stating that he had no reply from Mr. Derwart and could not understand why he had failed to extend him that courtesy. E. C. Rowe made no acknowledgement.

Having seen a statement made by the president of the

company to the effect that he would see that all its employees were treated fairly, Nance sent a telegram to the president, in Chicago, telling him he had been unjustly discharged from the Roanoke store on July 26th, by the district superintendent, A. M. Derwart, and that his attorney had written to both Derwart and Mr. Rowe without having received a reply; that "if action is not taken he would advise suit." In reply to this telegram, the company's president, wrote Nance under date of August 18th, stating: "I have no information about your release. Mr. Rowe is manager of the region, he determines his personnel, and I assume has placed another in charge because a better performance is required." His efforts to obtain a retraction and settlement having met with no success, Nance then instituted this suit.

The notice of motion contains eight counts, all of which are based upon the same defamatory words alleged to have been falsely spoken by Derwart with the intent to injure the plaintiff in his trade or calling, and causing him great mental suffering from shame, etc., as follows: "I (meaning the defendant, through the action of its agent, A. M. Derwart, acting within the scope of his employment) am discharging you (meaning bringing about a cessation of the services of the plaintiff to the defendant) because of inefficiency (meaning that said plaintiff was not capable of carrying on and conducting his business above described) and services not satisfactory to this company (meaning that said plaintiff, during the time of his employment by said defendant, had not acted in a manner satisfactory to said defendant and that said plaintiff was without sufficient knowledge of his work or ability to perform said work in an efficient manner and satisfactory to his employers.)"

The first count alleges slander at common law for the words spoken in the presence and hearing of Frances Showalter. The second count alleges slander under the Virginia statute of insulting words (Code 1919, section 5781), for the same words spoken in the presence and

hearing of Frances Showalter. The third count alleges slander under the statute for the same words spoken to O. L. Nance in the presence of Frances Showalter. The fourth count alleges common law slander for the same words spoken to Lura Jennings by Derwart when he dictated the letter to Nance, the same evening after Nance had left for home. The fifth count is for slander under the Virginia statute for the same words spoken at the same time to Lura Jennings. The sixth count is for libel at common law for the words contained in the letter dictated by Derwart, seen by Lura Jennings after she had written same. The seventh count is for libel under the statute for the same words contained in the same letter. The eighth count is for libel under the statute for the same words contained in the same letter read by Nance after he received it.

The defendant plead the general issue, and filed a plea of justification. At the conclusion of the plaintiff's evidence, and again at the conclusion of all the evidence, the defendant moved the court to strike the evidence, and later in the proceedings moved to set aside the verdict of the jury and enter judgment for the defendant. The rulings of the court in refusing these motions are assigned as error. As all three motions are based upon identically the same grounds, and as the same questions are presented under these assignments, they will be considered and disposed of together.

It is contended by the defendant that the words used are not actionable under the Virginia statute because there is no proof that the plaintiff was insulted thereby. While we think that plaintiff's conduct shows that he considered the words not only injurious to his reputation, but also as contemptuous and offensive, the answer to this contention is the language of the statute itself, providing that no demurrer shall preclude a jury from passing thereon. This provision can only mean that the question, whether the words declared on shall be construed as insults and tend to violence and breach of peace, is a ques-

tion for the jury alone and one with which the court has nothing to do. *Moseley* v. *Moss,* 6 Gratt. (47 Va.) 534; *Corr* v. *Lewis,* 94 Va. 24, 26 S. E. 385; *Boyd* v. *Boyd,* 116 Va. 326, 82 S. E. 110, Ann. Cas. 1916D, 1173.

It is next argued that the motion to strike the evidence and set aside the verdict should have been sustained because: (a) Under the three common law counts of the notice there is no proof of publication of the spoken or written words; (b) That the words were spoken upon an occasion of qualified privilege; (c) That the words did not transcend the scope of the privilege of the occasion; (d) That there is no proof of actual malice.

That the occasion was privileged is conceded. It is also conceded by the defendant that as to the words declared on under the statute no proof of publication is necessary.

The first question to be determined, therefore, is whether or not there was proof of such publication under the three common law counts of the notice, or either of them, as constitutes an abuse or violation of the privilege, it being necessary, in order to sustain a recovery for slander at common law, not only to allege but prove that there was a publication of the defamatory words.

The evidence shows that Mr. Derwart made ready to inform Nance that he was discharging him for inefficiency and because his services were unsatisfactory to the company. He went to the office of the cashier in the store and told Miss Frances Showalter he wanted her to come to his office on the second floor and take notes of the conversation, and although Miss Showalter informed him that she could not take notes, but could hear what was said, he then sent for Nance in order to carry out his purpose in Miss Showalter's presence and hearing. While it is true that the occasion does not lose its privilege where the communication of the defamatory words to the employee by the employer is done in the usual and customary course of the business in the presence and hearing of another employee who has an interest in the matter and a duty to perform in connection therewith (*Chalkley* v. *Atlantic*

*Coast Line R. Co.,* 150 Va. 301, 143 S. E. 631; *Thalhimer Bros.* v. *Shaw,* 156 Va. 863, 159 S. E. 87, 90), it is well settled that the employer has no right to use the words in the presence of a third person who has no interest in the matter and whose duties, though also an employee, do not bring the third person into the transaction.

In the case of *Thalhimer Bros.* v. *Shaw, supra,* where the plaintiff was accused by another employee of stealing an article of merchandise and concealing it in her bag, Mr. Justice Hudgins, in the course of the opinion rendered for the court said:

"The defendant had a right to make an investigation of the facts and circumstances connected with the finding of the merchandise in the bag, but in doing so it had no right to repeatedly charge the plaintiff with theft in such a manner that the accusation would be disseminated to other employees who at the time were charged with no special duty in regard thereto."

In Newell on Slander and Libel (2d Ed.), page 531, the author says:

"If the words were spoken in the presence of strangers wholly uninterested in the matter, the communication loses all privilege. The party must be careful that his words reach only those who are concerned to hear them. Words of admonition or confidential advice should be given privately, not shouted across the street, or written on post-cards, or published in the newspapers. The accidental presence of a third party will not alone, however, take the case out of the privilege, if it was unavoidable or happened in the usual course of business affairs. But if a party purposely contrives that a stranger should be present who has no right to be present, and who in the natural course of things would not be present, all privilege is lost. And whenever a person deliberately adopts a method of communication which gives unnecessary publicity to statements defamatory of another, the jury will be justified in finding malice."

The evidence shows that Miss Showalter was a pay-

roll clerk in the cashier's office, and had no interest whatever in hearing the communication, nor any duty to perform with reference thereto. While Derwart may have had a purpose of his own in calling on her to listen to the conversation, when he did so we think he went entirely beyond the scope of the privilege and the same constitutes publication of the words under the common law rule. The privilege of the communication because of the interest of Derwart and Nance therein was, therefore, lost. And it may be said that the same rule applies as to the words spoken in the presence of Miss Showalter, declared on under the statute, in the second and third counts of the notice.

As to the question of publication of the words communicated to Miss Lura Jennings at the time Derwart dictated the letter to Nance, we think the privilege prevailed, for the reason that Miss Jennings had a duty to discharge in the ordinary course of her employment in taking the dictation and typing the letter in question.

In *Chalkley* v. *Atlantic Coast Line R. Co.,* 150 Va. 30, 143 S. E. 631, 639, Chief Justice Prentis quotes from the leading case of *Owen* v. *J. S. Ogilvie, Pub. Co.,* 32 App. Div. 465, 53 N. Y. Supp. 1033, as follows:

"It may be that the dictation to the stenographer, and the reading of the letter, would constitute a publication of the same by the person dictating it, if the relation existing between the manager and the copyist was that of master and servant, and the letter be held not to be privileged. Such, however, was not the relation of these persons. They were both employed by a common master, and were engaged in the performance of duties which their respective employments required. Under such circumstances we do not think that the stenographer is to be regarded as a third person, in the sense that either the dictation or the subsequent reading can be regarded as a publication by the corporation. It was a part of the manager's duty to write letters for the corporation, and it was the duty of the stenographer to take such letter in shorthand, copy it out,

and read it for the purpose of correction. The manager could not write and publish a libel alone, and we think he could not charge the corporation with the consequences of this act, where the corporation, in the ordinary conduct of its business, required the action of the manager and the stenographer in the usual course of conducting its correspondence. The act of both was joint, for the corporation cannot be said to have completed the act which it required by the single act of the manager, as the act of both servants was necessary to make the thing complete. The writing and the coyping were but parts of one act, i. e., the production of the letter. Under such conditions we think the dictation, copying and mailing are to be treated as only one act of the corporation; and, as the two servants were required to participate in it, there was no publication of the letter, in the sense in which that term is understood, by delivering to and reading by a third person. There was in fact but one act by the corporation, and those engaged in the performance of it are not to be regarded as third parties, but as common servants engaged in the act."

Miss Jennings appears to have been regularly employed as a stenographer by the defendant company, and it was her duty to write letters for Derwart, who had general supervision of the store, as her superior employee. We, therefore, are of the opinion that the point is well taken as to the fourth and sixth counts in the notice charging slander at common law in speaking the words complained of to Miss Lura Jennings.

It is next urged that the occasion being privileged, it is necessary to prove actual malice and there was no proof of such malice. Since for the reasons stated, the privilege of the communication made by Derwart to the plaintiff in the hearing of Miss Showalter was lost under the circumstances, the plaintiff was relieved of the burden of proving malice on that occasion, for the reason that when the communication is unprivileged, malice is presumed. *Chaffin* v. *Lynch*, 83 Va. 106, 1 S. E. 803; *Dillard*

v. *Collins,* 25 Gratt. (66 Va.) 343; *Hansbrough* v. *Stinnett,* 25 Gratt. (66 Va.) 495; *Moseley* v. *Moss,* 6 Gratt. (47 Va.) 534. Assuming, however, that the burden was upon the plaintiff to prove actual malice, the question is whether the evidence is sufficient to justify the jury in so finding.

 When it has been determined by the court that a defamatory communication was privileged, "the question whether there was actual malice is for the jury to determine either from direct proof or as an inference from other proof or from the libel itself. In other words, the use which the defendant has made of his privilege,—that is, whether he has acted maliciously or not—is a question for the jury to decide." 17 R. C. L. p. 329; *Farley* v. *Thalhimer,* 103 Va. 504, 49 S. E. 644.

It is contended by the plaintiff that the evidence shows that at the time Derwart uttered the words complained of he did not in good faith believe that the plaintiff was inefficient. It appears that on July 25th, in the first interview between Derwart and the plaintiff, Derwart told Nance that he was not relieving him for anything personal, and not because his services were unsatisfactory to the company, but on account of the new policy of the company as to the employees. On the other hand, according to Nance, Derwart told him that he could dismiss him without pay, but was going to allow him two weeks' pay in advance, in consideration of his "good services" to the company. It is also apparent that after Derwart was informed of Nance's contract with Parker, he knew he could only dismiss Nance for good cause. After that he made several offers to settle the matter, none of which Nance would accept, and Nance was accused by Derwart of wanting to go into court. Subsequently, Derwart had a conversation with his superior, Mr. Rowe, over the telephone, who suggested to Derwart if he was satisfied that Nance was inefficient to tell him so. Up to that time Derwart had not intimated that Nance was inefficient or unsatisfactory, and such a thought had not apparently occurred to him.

■ Without discussing the evidence in further detail, we think the jury were justified in inferring from the facts and circumstances that after Derwart learned that Nance refused to be discharged on the ground that Parker had employed him for the balance of the year, and it was suggested by Rowe that he could be discharged for inefficiency notwithstanding the contract, Derwart undertook to discover some ground upon which he could base a claim of inefficiency. While he testified that the stock was not properly kept up or displayed by Nance, it seems to be clearly shown and not controverted that Nance had not been responsible for this for the thirty days before his discharge, and, therefore, Derwart must have known at the time he discharged Nance for inefficiency that the charge was untrue. This, of itself, was sufficient proof of malice. *Chesapeake Ferry Co.* v. *Hudgins,* 155 Va. 874, 908, 156 S. E. 429. It is not claimed by the defendant the evidence is insufficient to warrant the jury in finding that alleged defamatory words are untrue, and that the plea of justification was not, therefore, sustained. In fact it was shown that the plaintiff had many years experience in the business in which he was employed at the time of his discharge, and he produced a number of witnesses who testified as to his efficiency, honesty, and diligence in his work.

■ In view of the foregoing, and for the reasons stated, we think the court was right in refusing to strike the evidence, and to set aside the verdict of the jury on the ground it was contrary to the law and evidence, as contended by the defendant.

Error is assigned to the action of the court in overruling defendant's motion to strike out the evidence concerning a conversation between one Carmichael, a "personnel man" employed by the defendant, and plaintiff's witness, Hawkins. It appears that Mr. Carmichael came from Chicago, to Roanoke a few days before the trial of the case and got in touch with Hawkins, who was one of the men slated to be discharged along with Nance, and who

was still an employee of the company. Hawkins testified that Carmichael approached him and told him that he should consider his job in testifying in the case. He replied to Carmichael that he did not think the company wanted him to tell a lie about it, and all he was going to do was to answer the questions and tell the truth to the best of his ability.

Q. "What was his reply to you?"

A. "That there were lots of ways you could tell the truth, and I told him I did not know of but one."

Q. "Did he ask you what you were going to get out of the case?"

A. "Yes sir, and I told him nothing, but more than likely I would lose my job."

It is contended by the defendant that this conversation was nothing more than the personal opinion of an individual who happened to be an employee of the company and there was no proof that this man was authorized to approach Hawkins except that he happened to represent Montgomery Ward & Company.

Plaintiff insists that the evidence was proper to be considered by the jury for what it was worth as tending to show that defendant's representative from Chicago, where the legal department of the company was located, was tampering with the witness.

In a colloquy between counsel and the court on the subject, counsel for the defendant insisted that there was no proof that Carmichael was sent to Roanoke by the corporation. The court said:

"I do not know, and Mr. Dillard (counsel for plaintiff) has not said he was sent here by the company, but he has the right to argue that that is a very strong circumstance."

We think that under the circumstances the evidence was proper to be considered by the jury for what it was worth, the weight of the evidence being entirely a question for the jury. Neither do we think the remark of the court was prejudicial. The court was merely giving its reasons for overruling defendant's objection to the

admissibility of the evidence, and the remark, at the most, was harmless.

It is next assigned as error that the court was wrong in not permitting the defendant's witness Derwart to testify as to his feelings towards Mr. Nance. It appears that upon the question being objected to, the court ruled that it was entirely a question for the jury. "He can testify what he did and then the jury can draw their conclusions from that. He can state what he did and why he did it, but whether or not it is malice is a question for the jury."

It has been held in Virginia that it is inadmissible to ask a defendant his feelings and motives in making a slanderous charge and whether it was made with ill will against the plaintiff, as his feelings and motives are immaterial after the slanderous words are proven to have been spoken, and the law will not allow him to say no malice was intended. *Dillard* v. *Collins,* 25 Gratt. (66 Va.) 343.

It appears, however, that after this ruling of the court, that Derwart was permitted to testify that he never had any trouble from Mr. Nance besides the business of checking his department and that he was a man he liked personally. Therefore, even if the court was in error in its ruling on the subject, in view of the subsequent testimony of Derwart which went to the jury without objection, the error was harmless.

It is claimed that the court erred in permitting plaintiff's counsel to argue to the jury that the defendant "kicked him down farther," by filing a plea of justification alleging that the words were true. This statement was, however, withdrawn immediately by counsel for the plaintiff and the court upon the objection being made sustained it. We therefore, find no merit in this assignment.

It is complained that the court gave the jury the following instruction, known as No. 6.

"The court further instructs the jury that by 'actual malice' we do not mean malignity of heart or ill will

toward O. L. Nance alone, but it includes other sinister or improper motives.

"In a legal sense any unlawful act done wilfully or purposely to the injury of O. L. Nance is, as against O. L. Nance, actual malice."

It is contended that the last clause in the instruction is equivalent to telling the jury that malice may be implied from such unlawful act, although in a case of qualified privilege such as this, malice cannot be implied, and the burden of proof rests upon the plaintiff to show malice in fact. While the instruction may be awkwardly worded we do not think it is calculated to mislead the jury. It simply tells them that actual malice in law is any unlawful act done wilfully or purposely to injure the plaintiff. If this is the proper interpretation of the language of the instruction, there was no error in giving it. It may further be said that in numerous instructions offered by the plaintiff, the jury were told that actual malice must be proved in order to justify recovery when the occasion is one of qualified privilege. The defendant also offered an instruction which was given, telling the jury that the defendant must have acted with actual malice as to fact, that is to say, that the defendant must have spoken and written the words complained of to the plaintiff not believing them to be true or that they were spoken and written from some sinister or corrupt motive, or from motives of personal spite, ill will or with such gross indifference as to be wilful and wanton. We, therefore, find no prejudicial error in the instruction complained of.

It is complained that the court erred in instructing the jury that if they believed from the evidence that A. M. Derwart was an agent for the defendant; that he was acting in the scope of his employment; that, so acting, he spoke the words alleged in count No. 1 in the presence of Frances Showalter with actual malice, and that said words tended to injure O. L. Nance in his trade or calling, then they should find for the plaintiff, whether they believe said words from their usual construction and common

acceptation are construed as insults and tend to violence and a breach of the peace, or not, provided they believe said words untrue.

It is contended by the defendant that this instruction was wrong because there was no publication of the spoken words. As already said, we are of the opinion that the words spoken in the presence of Miss Showalter constituted publication under the common law rule, and being unprivileged, even though there was no actual malice proved, plaintiff would be entitled to recover under the first count on that ground.

Counsel cite authorities in which it is held that the mere fact that a third person not legally interested in the communication was accidentally present or heard it, will not alone take the occasion out of the privilege, but in this instance the evidence shows that Derwart deliberately and purposely had Miss Showalter present to hear the conversation, although, she, herself, was not interested and had no duty to perform in regard to the matter.

It is complained that the refusal of the court to give instruction "G" was in error. This instruction tells the jury that even though they believe that the words were uttered in the presence and hearing of Miss Showalter yet no publication existed. For the reasons stated the court was right in refusing this instruction.

Upon consideration of the whole case, we are of the opinion that the judgment of the lower court should be affirmed.

*Affirmed.*