## W. M. TAYLOR v. C. M. GRACE.

March 12, 1936.

Present, Holt, Hudgins, Gregory, Chinn and Eggleston, JJ.

The opinion states the case.

*John W. Massey,* for the plaintiff in error.

*J. Winston Read* and *W. R. Walker,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

W. M. Taylor instituted this action for insulting words under the provisions of Code, section 5781. After all the evidence was in, the court sustained a motion by defendant to strike. This action of the court is the error assigned.

Plaintiff contends, and we think correctly, that a motion to strike the evidence is similar to a demurrer to the evidence. The distinction between the two is pointed out in the following cases: *Green* v. *Smith,* 153 Va. 675, 151 S. E. 282; *Buchanan* v. *Wilson,* 159 Va. 49, 165 S. E. 422; *Catron* v. *Birchfield,* 159 Va. 60, 64, 165 S. E. 499; *Virginia Electric & Power Company* v. *Mitchell,* 159 Va. 855, 164 S. E. 800, 167 S. E. 424; *Holladay* v. *Colt,* 163 Va. 866, 177 S. E. 862; Burks' Pleading and Practice (3d Ed.) 454.

Plaintiff concedes that on motion to set aside the verdict awarding damages in an action for insulting words, it is the duty of the court to sustain the motion, if the evidence was insufficient to support the verdict.

This is in harmony with the ruling of *Corr* v. *Lewis,* 94 Va. 24, 26, 26 S. E. 385, 386, where it is said:

"While the court would have the power to correct any manifest departure from right and justice on the part of the jury, still it must be conceded that the jury is regarded as the best and safest tribunal for determining the issues in such cases as the one before us. Hence the provision in the section quoted that no demurrer shall preclude a jury from passing on the case." See *Chesapeake Ferry Co.* v. *Hudgins,* 155 Va. 874, 875, 156 S. E. 429; *Rosenberg* v. *Mason,* 157 Va. 215, 160 S. E. 190; *Montgomery Ward & Co.* v. *Nance,* 165 Va. 363, 182 S. E. 264, 271.

In ruling upon such a motion, the court must determine from all the evidence, whether or not there is any reasonable hypothesis on which the jury could have based a verdict for plaintiff, and decide accordingly.

The conceded facts in the case are, that C. M. Grace is the organizer and head of a religious or quasi-religious

congregation of negroes in the city of Newport News, known and called the "House of Prayer." This congregation is governed by what purports to be a constitution and by-laws, from which it appears that the supreme authority is the bishop, who is authorized to appoint and remove all officers at will. His powers are defined as follows: "The chief executive officer and spiritual adviser of this organization shall be designated as bishop; and the present bishop, C. M. Grace, being the founder of the organization, shall hold the office for the period of his natural life. The general assembly and congregations of this organization shall have no power whatsoever to interfere with his visions, rights or powers in building and making growth in the said congregation, neither shall they have power to judge or condemn him, as he is our high power and our general head on earth, and we shall have no power to judge him. According to the words of the Apostle Paul, he is only to be judged by the Almighty God."

Notwithstanding the last sentence quoted, it is our duty to "judge" the bishop on the record in this case.

W. M. Taylor was appointed treasurer of this congregation, and soon after it was organized, Grace loaned it $10,-000 for the purpose of erecting a house of worship. The congregation, through its duly appointed officers, executed a deed of trust to secure this sum, which was evidenced by twenty notes, payable to C. M. Grace. At the same time, Grace executed twenty checks for $500 each, payable to the First National Bank of Newport News (some of the checks were for more than this, which apparently includes interest on the notes), and signed the checks "C. M. Grace, trustee for the House of Prayer." The notes were placed in the First National Bank for collection, and the executed checks delivered to Taylor. The weekly collections from the congregation were counted by a committee, in the presence of a secretary who kept the books. Current bills were paid from the collections and the residue placed in the First National Bank to the credit of C. M. Grace,

trustee, etc. Taylor's instructions were, that whenever the accumulated deposits in the bank to the credit of Grace, trustee, etc., amounted to $500 or more, to deliver one of the twenty checks to the bank and receive in exchange therefor, one of the notes marked "Paid." The bank endorsed the check, and placed the proceeds to the personal credit of C. M. Grace. The fiscal affairs of the House of Prayer were so managed for several years.

At a meeting of the congregation, held on June 3, 1932, the bishop, from a rostrum, discussed the payment of the notes. Taylor's testimony of what occurred on this occasion is as follows:

"He, the bishop, asked me "How many notes have you got out of the bank?" I said, "There is nine out, existing, and I have got nine of those myself." He said, "Oh, no, you have not got no nine notes." I said, "I have got nine." He said, "I know you have not." Two fellows got up then and said, "Yes, he has got them." And he insulted me, and I went on out of the church."

The account of this meeting given by other witnesses is substantially as follows:

"On that night, the bishop came in, and speaking to the children, he says, "Children, how are you all getting along, are you getting along, feeling good?" The next he says, "How are you getting along in raising your money on paying your notes?" he says "I don't believe—I think you have paid six," talking to the congregation, directly facing the congregation, and there was an answer came, I heard "We have paid nine." That called my attention, and that response was from Richard Grevious. Secondly, the response came from Brother Taylor "Nine." The bishop says to Taylor, "Where are they?" "They are in my safe." "Go get them." He said, "Well, I can't get in the safe tonight, I don't know the combination." "I will go with you." And that was the conversation.

Grace testified that on the next day, upon inquiry at the First National Bank, he was informed that only six notes had been paid, and that on the night of June 4th,

he so informed the congregation. Taylor, in his notice of motion, alleged that it was at this meeting of the congregation Grace defamed him by utterance of the following words:

"Now, you all beat me down last night that you had nine notes. I have been over to the First National Bank and they told me there had only been six notes taken out of the bank, and I believe the man."

Plaintiff contends that the defendant, by the use of the above language, meant that he had made a false report of the financial affairs of the congregation entrusted to him, and that he had misapplied $1,500, the sum represented by the three notes.

"The innuendo is intended merely to explain such parts of the defamatory words as are equivocal, or obscure, or need explanation. The innuendo can never enlarge the meaning of the words used. The innuendo is simply explanatory of matter which has already been sufficiently expressed." Burks' Pleading and Practice (3d Ed.) 265.

A literal meaning of the words used do not import misapplication of funds. This being true, it would be encumbent upon the plaintiff to prove that the manner and circumstances in which the words were uttered conveyed the meaning placed upon them by him.

Taylor admits that under the financial scheme adopted, it was impossible for him to misapply any money belonging to the congregation after it had been placed in bank, as the money was deposited to the credit of C. M. Grace, trustee, etc., and could only be withdrawn by checks signed by the trustee. All checks so signed, in his possession were payable to the First National Bank, by whom each had to be endorsed before payment.

No one seems to know how many notes had been paid. The bishop, in his testimony, stated that he said he "believed" only six had been paid. Taylor and two other members of the congregation stated that nine notes had been paid.

After this meeting on June 4th, Grace and Taylor had

a conference, in the presence of two other members of the congregation, where it was ascertained that thirteen notes had been paid. Taylor had paid nine with checks left with him, and another treasurer, who succeeded him, had paid four notes with checks signed by the trustee.

It thus appears that neither Taylor nor the bishop were correct in their respective statements to the congregation. Under these circumstances, the language upon which the action is based, cannot be construed to mean that the defendant intended, or the congregation understood the language to mean that Taylor had stolen $1,500, evidenced by three notes of $500 each.

This leaves for our consideration the statement that Taylor had made a false report of the financial affairs of the congregation entrusted to him.

A communication, made in good faith, on a subject matter in which the person communicating has an interest, or owes a duty, legal, moral or social, is qualifiedly privileged if made to a person having a corresponding interest or duty. The subject matter discussed by plaintiff and defendant, was the payment of obligations which the congregation had authorized to be made. To the discharge of these obligations, the members were making voluntary contributions from time to time. The bishop, as the leader or head of the organization, was interested, and in addition, was the creditor to whom the obligations were due.

The plaintiff concedes the occasion was qualifiedly privileged, and contends that it should have been left to the jury to ascertain whether or not the privilege had been abused or whether or not the words were uttered with actual malice. In support of this contention, he quotes a recent expression of this court as follows:

"When it has been determined by the court that a defamatory communication was privileged, 'the question whether there was actual malice is for the jury to determine either from direct proof or from the libel itself. In other words, the use which the defendant has made of

his privilege—that is, whether he has acted maliciously or not—is a question for the jury to decide. 17 R. C. L., p. 329; *Farley* v. *Thalhimer,* 103 Va. 504, 49 S. E. 644." *Montgomery Ward & Co.* v. *Nance, supra.*

Taylor testified, that before he was removed as treasurer, he informed the members of the congregation from time to time, how much they had paid, and were paying on the debt; that Grace, talking to him privately, had objected to this, as he did not want the congregation to know how much of the debt had been paid. That sometime before the meeting, he told Grace that he had paid nine of the notes with the checks, and that Grace knew this was a fact before he made the defamatory remarks.

In this connection, it must be remembered that Grace had organized this quasi-religious body, that he had adopted, or caused to be adopted, a financial scheme which gave him absolute control of all the money collected and deposited in bank, that notwithstanding this evidence of unusual intelligence regarding financial affairs, he claimed to be ignorant of the fact that more than $3,500, in the course of several months, had been paid by the congregation, through Taylor and another, on the obligations, and that the payments were made by checks signed by him, as trustee, the proceeds from which were deposited to his personal credit.

It is reasonable to infer that when the checks were delivered to the bank, and marked "paid," and the proceeds deposited to his credit, the bank notified him of that fact, and if it did not, he could have demanded of the bank a statement showing the exact status of both accounts; he claimed he did go to the bank, and the officers of the bank informed him that only six notes had been paid. In this statement, he is not corroborated by any officials of the bank.

Taylor further stated, and he was corroborated in part by other witnesses, that after he had produced the notes to Grace and two other members of the congregation, he requested Grace to correct the wrong he had done him

by informing the congregation of the number of notes paid, to which Grace had replied: "I won't do that—to do so would lower my standing, and I don't want the people to know I was lying."

Some six months after this request, Taylor received the following letter from Grace:

"Washington, D. C. Dear Bro. Taylor: Just to say to you that I know your plans and your evil idea in trying to hurt my influence after I bore with you so long, and at last you was caught doing wrong in the H. of P. and I had and yet have chance to hurt your business, but I have not expose your deeds with the people. I loaned you $500.00 and never got it back, you quit the H. of P. keeping from judgment and I have been bearing all for God Sake. Still you have the caurage to say what you are saying and have a bunch working with you to hurt me, but it is alright.— Remember Dr. Moore in N. C. and his wife— Remember that God is not sleeping, whatever you sow you shall reap. I rather see you praying than to hurt God's work.

"I am as ever

"C. M. G—.

"Your business could have been running nicely had you tried to get things *strate."*

█ The full import of this letter is not clarified by the evidence, but from the letter and the testimony summarized above, the jury could reasonably have inferred that Grace, in accusing Taylor of making a false report, was actuated by malice.

In view of this evidence and the provision of the statute—that: "No demurrer shall preclude a jury from passing thereon,"—the judgment of the trial court will be reversed and the case remanded.

*Reversed.*