Michael Stanley SWENGLER,
Plaintiff–Appellee,

v.

ITT CORPORATION ELECTRO–OP-
TICAL PRODUCTS DIVISION,
Defendant–Appellant.

Michael Stanley SWENGLER,
Plaintiff–Appellee,

v.

ITT CORPORATION ELECTRO–OP-
TICAL PRODUCTS DIVISION,
Defendant–Appellant.

Nos. 91–2743, 91–2744.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 3, 1993.

Decided March 22, 1993.

Amended by order May 6, 1993.

Melissa Windham Friedman, Roanoke, VA, argued (Anthony F. Anderson, on brief), for defendant-appellant.

Bayard Easter Harris, The Center for Employment Law, Roanoke, VA, argued (Agnis Chakravorty, on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, HAMILTON, Circuit Judge, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

## OPINION

HAMILTON, Circuit Judge:

Michael Swengler (Swengler) appeals the district court's grant of a directed verdict in favor of the Electro–Optical Products Division of ITT Corporation (ITT), dismissing his claim for breach of an employment contract. ITT cross-appeals the district court's grant of a directed verdict in favor of Swengler, dismissing its claim for defamation.

Although we affirm the dismissal of the claim for breach of contract, we believe the

district court erred in dismissing ITT's defamation claim and, therefore, reverse the directed verdict in favor of Swengler. Because no triable issues of fact remain with respect to liability, we remand the case to the district court with instructions to enter a judgment in favor of ITT on its defamation claim and hold a jury trial solely for the purpose of determining damages.

## I

This action arose from an employment contract between Swengler and ITT. In March or April 1987, ITT began actively recruiting Swengler while he was working for another company. At that time, Swengler worked as an expert in the development of a component of "night goggles," which the United States Army uses during night maneuvers and night combat. ITT sought to hire Swengler to assist in ITT's development of its own "night goggle" product.

As a result of ITT's solicitations, in April 1987 Swengler traveled to Roanoke, Virginia to interview with ITT. During this visit, Swengler met with several ITT employees, including the personnel director, Tom Mathis (Mathis). During his discussions with Mathis, Swengler expressed his desire to obtain a "permanent, full time [and] very stable" position with ITT. Joint Appendix (J.A.) at 57. In response, Mathis allegedly told Swengler that he would only be fired "for cause," and that the position would be "permanent and full time." *Id.*

After this visit, in early May 1987 Mathis extended a verbal offer for employment to Swengler.[1] Swengler responded that the offer had to be in writing and that he would in turn give a written acceptance if the written offer contained acceptable terms. J.A. at 52. Swengler also requested Mathis to include several specific terms in the written offer of employment. J.A. at 54. On May 15, 1987, Mathis mailed Swengler a letter formally offering him employment with ITT. This letter provided several terms of employment, but contained no promise that Swengler

would only be terminated "for cause." In addition, the letter stated "if you require further information on any point that we may have failed to cover, do not hesitate to call me...." J.A. at 214. Swengler then returned a written acceptance of this employment offer.[2]

On June 1, 1987, Swengler began working for ITT. At his orientation, Swengler asked to see ITT's employment policy applicable to him. In response, ITT's personnel department provided him with its "internal separation policy" memo. Usually, ITT does not disseminate this memo to all of its employees, instead it is distributed only to supervisors. J.A. at 190. This memo indicated that for company-initiated terminations, the employee's personnel record "must contain objective, reasonable evidence to support the decision to terminate the employment of the individual." J.A. at 216a. The memo also specified that such documentation "will include":

(a) examples of poor performance (substantiated where possible);

(b) record of meetings held by the supervisor to explain performance problems;

(c) performance standards to be attained by the employee and the probationary period set to meet the standards; and

(d) record of the employee's job performance standards during the probationary period.

The memo also stated that "if written records are inadequate, separation cannot be effected at that time." J.A. at 217.

Beginning in August 1987, Swengler's immediate supervisor, Larry Kiser (Kiser), authored several memoranda outlining certain jobs and responsibilities assigned to Swengler. The first memo in August 1987, directed at Kiser's supervisor Albert Tien (Tien), specifically outlined various responsibilities which Swengler and Kiser were to assume for the remainder of 1987. The memo also mentioned that several projects had fallen

---

1. Neither party disclosed the specific terms of this offer.

2. At trial, Swengler testified that, after receiving the letter and based on Mathis' alleged promises, he thought he could leave ITT at any time. J.A. at 55.

behind schedule and that Kiser's group was severely understaffed. J.A. at 221.

The second memo, written on January 27, 1988 and directed at Swengler, outlined specific projects and responsibilities assigned to Swengler for the new year. The memo also required Swengler to create schedules for his assigned tasks, including start dates, completion dates and any accomplishments. Finally, the memo required Swengler to send these schedules to Kiser every week. J.A. at 225.

The third memo, written on February 23, 1988, provided a revised list of Swengler's goals and responsibilities and also detailed the specific requirements for previously assigned tasks which Swengler had not yet completed. The memo also required Swengler to provide weekly progress reports detailing any progress made on his assignments. If no progress was made, Swengler was to indicate such on the report.

On June 10, 1988, Kiser requested Swengler to compose a list of Swengler's accomplishments achieved since starting with ITT. Kiser then made several handwritten notations on the list, apparently contradicting Swengler's claimed accomplishments. J.A. at 232–35.

On June 14, 1988, Swengler met with Kiser and Tien to arrange a time frame in which Swengler would complete various tasks assigned to him. At that meeting, Swengler stated that he would accomplish seventeen various tasks within six weeks. After that meeting, Kiser authored a memo to Swengler stating "please find attached the list of projects we mutually agreed will be your responsibility during the next six weeks. Please provide me with a schedule, including milestones and completion dates, that addresses all items on the list." J.A. at 236. Two days later, Kiser sent this list to Tien with an attached memo stating "Mike Swengler and I have discussed the status of his projects. I made a list of those items that he needs to address. We have reviewed the list together and he has agreed with its contents. Mike has a schedule for completion of these tasks in the next six weeks." J.A. at 232. Notably, none of the memos from Kiser specifical-

ly mentioned that Swengler was performing below standard.

In addition to these memos, Swengler met almost daily with Kiser to discuss progress on Swengler's assigned tasks. However, the parties presented conflicting testimony as to whether Kiser ever told Swengler during these meetings that Swengler's performance was substandard. There is also conflicting testimony as to whether Kiser or Tien told Swengler in the June 14, 1988 meeting that Swengler would be fired if he did not complete the designated tasks within six weeks. J.A. at 61–63.

In August 1988, Kiser completed a form evaluating Swengler's performance during the six week period from June 16 to August 1, 1988. This report contained numerous negative assessments of Swengler's work habits. Some of the remarks included:

—he has consistently had difficulty scheduling and completing assignments; and

—he lacks the insight and attention to details that are necessary to complete a job thoroughly and on time.... This has prevented me from assigning him more complex tasks.

J.A. at 260–61. The report summarized Swengler's overall performance as "unsatisfactory," and indicated that ten of the seventeen tasks which Swengler had promised he would complete within the six week period were not completed as promised. J.A. at 175–78, 281. Swengler did not receive a copy of this report. On August 26, 1988, ITT terminated Swengler's employment.

On June 1, 1989, nearly a year after termination, Swengler wrote a letter to the program manager at NVEOL. NVEOL is the technical arm of the United States Army's contracting agency which procures government contracts for "night goggles." In this letter, Swengler made several negative remarks about ITT, including:

(a) criticisms on the quality of ITT's product, stating that in his opinion it was the "poorest performing product manufactured in the country";

(b) allegations that the director of engineering at ITT (Tien) was from communist

China and, in his opinion, a "serious security risk";

(c) statements that in his opinion, ITT was infringing on existing patents; and

(d) allegations that ITT's technical staff was defrauding the government, mismanaging government funds and was the most poorly managed of those companies in a business similar to ITT's.

J.A. at 287–93. Swengler concluded in this letter, "I respectfully suggest that [ITT] be scrutinized very carefully regarding their current contract and any future contract considerations." J.A. at 293. Swengler later admitted that he made no attempt to investigate the validity of any of these allegations because, as a former employee of ITT, he had personal knowledge of these matters.

Believing that he was fired without just cause, Swengler filed suit against ITT on August 22, 1989 in the United States District Court for the Western District of Virginia. Swengler alleged three causes of action: (1) breach of employment contract; (2) fraud; and (3) conspiracy. ITT counterclaimed for: (1) defamation *per se;* (2) tortious interference with contractual relations; and (3) common law breach of an employee's fiduciary duty.

Before trial, the district court granted ITT's Fed.R.Civ.P. 12(b)(6) motion as to Swengler's conspiracy claim. On November 4, 1991, before presenting any evidence at trial, ITT voluntarily dismissed its tortious interference and breach of fiduciary duty claims. At the conclusion of Swengler's case, ITT moved for a directed verdict as to Swengler's contract and fraud claims. The district court granted the motion as to the fraud count but took under advisement the defendant's motion respecting the contract claim. The district court also advised the parties to take a brief recess to discuss the possibility of both parties dropping their respective claims. The district court noted that it appeared doubtful Swengler could proceed on his contract claim as a matter of law, but it endeavored to avoid a finding of liability on ITT's defamation claim against Swengler. J.A. at 144–46. Although ITT was willing to drop its claim, Swengler was not.

Upon completing its own evidence, ITT renewed its motion for a directed verdict as to the contract claim. The district court granted this motion, reasoning that:

if it were not for the procedures to be followed in terminating an employee that's been introduced as an exhibit, I would rule as a matter of law that [it's] employment at will and could be—but then looking at it in a light most favorable to the plaintiff, as I have to, then I think the evidence is to the effect that the defendant has complied with the personnel requirements.

J.A. at 203. The district court added that ITT had sufficient documentation from the memoranda to create just cause for termination, adding that "you don't have to label it poor performance, but [it's] certainly there." J.A. at 204. The district court also directed a verdict in favor of Swengler, dismissing ITT's defamation claim. The district court reasoned that "there has been no evidence of any damages in this case and so as to the counterclaim I'm going to direct a verdict in favor of the plaintiff." J.A. at 207.

Swengler now appeals the directed verdict against his contract claim only. In response, ITT appeals the directed verdict against its defamation claim.

II

In his appeal, Swengler raises two arguments. First, Swengler contends that either the alleged oral promise by Mathis or ITT's internal policy memo created an implied condition to his employment contract, allowing ITT to fire him only for "just cause." Second, Swengler claims that the district court improperly ruled that ITT's evidence established "just cause," reasoning that the jury should have decided this issue.

We conclude that, under Virginia law, neither the alleged oral promise nor the internal policy memo created an implied condition to the employment contract and, therefore, ITT did not need "just cause" to fire Swengler. Because of this conclusion, we need not address Swengler's second argument. We discuss our conclusions with respect to the oral promise and the internal policy memo separately.

## A

Generally, Virginia adheres to the common law rule of employment at will. *Miller v. SEVAMP, Inc.,* 234 Va. 462, 362 S.E.2d 915, 916–17 (1987). Under this rule, it is presumed that "either party is ordinarily at liberty to terminate the contract at will upon giving reasonable notice of intention to terminate." *Bowman v. State Bank of Keysville,* 229 Va. 534, 331 S.E.2d 797, 798 (1985). However, "this presumption is rebutted when the employer promises that the relationship will end only for good cause and the employee relies on that promise." *Frazier v. Colonial Williamsburg Foundation,* 574 F.Supp. 318, 320 (E.D.Va.1983). *See also, Norfolk Southern Ry. Co. v. Harris,* 190 Va. 966, 59 S.E.2d 110, 114–15 (1950).

Without more, these principles might require a conclusion that Mathis' oral promise rebutted the presumption of employment at will. However, the parties in the present case formalized their employment contract in writing. Because the written contract, *i.e.* the written offer and acceptance, contains no stipulation that ITT could only fire Swengler for "just cause," Swengler cannot supplement the written contract with the oral promise unless he can avoid Virginia's parol evidence rule. This rule prohibits using extrinsic evidence of "prior or contemporaneous negotiations . . . to alter, contradict or explain the terms of a written instrument provided the document is complete, unambiguous and unconditional." *Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner,* 225 Va. 508, 303 S.E.2d 894, 898 (1983).

Swengler argues that the partial integration doctrine allows him to supplement the written contract with Mathis' oral promise. We disagree. Under Virginia law, this doctrine allows parties to a contract to supplement the terms of the writing with extrinsic evidence only if: (1) the parties did not reduce their entire agreement to writing; (2) the extrinsic evidence does not contradict or vary the written terms; and (3) the extrinsic evidence involves items on which the parties agreed contemporaneously with the writing. *High Knob, Inc. v. Allen,* 205 Va. 503, 138 S.E.2d 49, 52 (1964). Despite Swengler's argument to the contrary, we believe that the facts in the present case fail to satisfy the first and third requirements of this test.

With respect to the first requirement, we think the writing contained the entire agreement between ITT and Swengler for two reasons. First, Swengler specifically rejected Mathis' verbal offer, indicating that he "had to have the offer in writing." J.A. at 52. Obviously, this response reflects Swengler's desire for ITT to formalize the entire offer in writing. Second, even though the letter offering Swengler employment did not specifically state that it represented the entire agreement, it did mention that "if you require further information on any point that we may have failed to cover, do not hesitate to call me. . . ." J.A. at 214. Thus, absent any response to this request by Swengler, we think it is reasonable to assume that both parties were satisfied by the terms provided in the letter.[3]

With respect to the third requirement of the partial integration doctrine, we believe that Mathis did not make the oral promise "contemporaneously" with the writing. Mathis allegedly made this promise in April 1988, during Swengler's interview. After these negotiations, Mathis extended a verbal offer in early May 1988. In response, Swengler specifically told ITT that he "had to have the offer in writing and would in turn give them an acceptance in writing." J.A. at 52. Only after ITT sent a written offer on May 15, 1988 did Swengler accept the offer. Thus, the parties entered the contract more than a month *after* Mathis made the alleged oral promise.

In summary, we believe that the writing reflected the entire agreement between ITT and Swengler and that Mathis did not make the alleged oral promise "contemporaneously" with the writing. Accordingly, the partial integration doctrine does not allow Swengler to supplement the written contract with the oral promise by Mathis. Consequently,

---

**3.** We find further support for this conclusion from the fact that Swengler apparently told Mathis to include certain particular terms in the written offer letter. J.A. at 54. Thus, presumably Swengler could have requested Mathis to include the "just cause" provision.

Mathis' oral promise did not require ITT to fire Swengler only "for cause."[4]

### B

■ Swengler also asserts that ITT's internal policy memo, requiring ITT to provide documentation before firing an employee, created an implied condition to his employment contract. In support, Swengler relies on *Seabolt*, 703 F.Supp. at 1241, for the proposition that ITT was compelled to follow the procedures under its internal policy memo before it could fire him.

We conclude that the *Seabolt* opinion does not require us to add an implied condition to the employment contract in the present case. In *Seabolt*, the plaintiffs alleged that the defendant employer provided manuals to them at the time they were hired. These manuals provided specific procedures for terminating employees. Although the defendant employer in *Seabolt* generally provided the manual only to supervisors, the facts suggest in that one instance, the employer initiated the distribution of the manual to the plaintiff employees. The *Seabolt* court held that "where an employer, in its own employee handbook, ha[s] made 'specific promises to its employees not to dismiss them without ... just cause,' it ha[s] fixed the duration of the employment according to the procedures set out in the handbook." *Id.* at 1241, quoting *Thompson v. American Motor Inns, Inc.*, 623 F.Supp. 409, 416 (W.D.Va.1985).

■ In the present case, however, the evidence clearly indicates that ITT does not generally distribute the internal policy memo to employees and that ITT gave Swengler a copy of this memo *only after* Swengler specifically asked to see it. We believe this distinction is critical. The general rule recognizes that no implied contract arises from policy manuals which are not generally distributed to employees. *Lakeside v. Freightliner Corp.*, 612 F.Supp. 10, 12–13 (D.Or.

1984); *Cote v. Burroughs Wellcome Co.*, 558 F.Supp. 883, 888 (E.D.Pa.1982). We think that, under Virginia law, this rule should also apply when an employer does not generally distribute a policy manual, but instead provides such a manual only upon request by an employee. *See, e.g., Jimenez v. Colorado Interstate Gas Co.*, 690 F.Supp. 977, 979 (D.Wy.1988) (distinguishing between those personnel manuals not generally distributed and those "posted in the employee's coffee room"); *Lakeside*, 612 F.Supp. at 12–13 (fact that employer restricted access to policy manual suggests manual should not create an implied contract).

Because ITT did not generally distribute its internal policy memo to employees and provided the memo to Swengler *only after* he requested a copy, the internal policy memo cannot be used to create an implied condition to Swengler's employment contract. Thus, Swengler's employment was at will and ITT could fire Swengler without "just cause."

### III

■ In ITT's cross-appeal, it argues that the district court erred in directing a verdict on its counterclaim for defamation merely because ITT produced no evidence on damages. In support, ITT contends that, under Virginia law, Swengler's letter amounted to defamation *per se*, a tort which presumes damage to the injured party. Thus, ITT concludes that it was not required to introduce evidence regarding damages. We agree.

■ Under Virginia law, it is defamation *per se* to make false statements which "prejudice [a] person in his or her profession or trade." *Great Coastal Express v. Ellington*, 230 Va. 142, 334 S.E.2d 846, 849 (1985). For such prejudice to arise, the statements must relate to "the skills or character required to carry out the particular occupation

---

4. We also note an alternative basis for reaching the same conclusion. At trial, Swengler admitted that he thought he could quit ITT at any time. J.A. at 55. Under the doctrine of mutuality, if Swengler could quit at any time, ITT could also fire Swengler at any time. *See, e.g., Hicks v. Freeman*, 397 F.2d 193, 194–95 (4th Cir.1968) ("It is hornbook law that a contract terminable

at the will of one party is terminable at the will of the other party."); *Seabolt v. Westmoreland*, 703 F.Supp. 1235, 1238 (W.D.Va.1989) ("if an employee is free to quit his employment at any time, notions of fundamental fairness require that the employer be free to discharge him at any time.").

of the plaintiff." *Fleming v. Moore,* 221 Va. 884, 275 S.E.2d 632, 636 (1981). Thus, a corporation may be defamed *per se* by statements "which cast aspersion on its honesty, credit, efficiency or its prestige or standing in its field of business." *General Products Co., Inc. v. Meredith Corp.,* 526 F.Supp. 546, 549–50 (E.D.Va.1981).[5] In addition, if a plaintiff establishes a claim for defamation *per se,* Virginia law presumes that the plaintiff suffered actual damage to its reputation and, therefore, does not have to present proof of such damages. *Fleming,* 275 S.E.2d at 636. Moreover, under defamation *per se* "it is generally held that punitive damages may be awarded even though actual damages are neither found nor shown." *Newspaper Publishing Corp. v. Burke,* 216 Va. 800, 224 S.E.2d 132, 136 (1976). However, recovering punitive damages requires clear and convincing proof that the defendant made the statements with "actual malice." *Ellington,* 334 S.E.2d at 853, citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Virginia law defines "actual malice" to include a statement made with "knowledge that it was false or with reckless disregard of whether or not it was false." *Burke,* 224 S.E.2d at 136; *Ellington,* 334 S.E.2d at 853.

According to these principles, we conclude that Swengler's letter clearly constituted defamation *per se.* The statements by Swengler included allegations that: (1) Tien posed a serious security risk; (2) ITT was infringing on patents; and (3) ITT's technical staff was defrauding the government and mismanaging government funds. Obviously, these statements "cast aspersion [on ITT's] honesty ... [and] standing within its field." *Meredith Corp.,* 526 F.Supp. at 549–50.

■ In reaching this conclusion, we reject two arguments which Swengler offers in support of the directed verdict dismissing ITT's defamation claim. Swengler argues that he prefaced each of the alleged defamatory statements with the qualification "in my opinion." Because statements clearly representing the personal views of the speaker are

not defamatory, Swengler concludes that the statements in his letter do not create a claim for defamation. In support, Swengler cites to *Chaves v. Johnson,* 230 Va. 112, 335 S.E.2d 97, 102 (1985).

■ We reject this argument because Swengler's statements implied the existence of fact and were not "pure" opinion. Statements clearly implying the existence of facts are actionable as defamation. *Ollman v. Evans,* 750 F.2d 970, 982 (D.C.Cir.1984); Restatement (Second) of Torts § 566, Comment (b) (statements that imply the existence of facts that would justify the opinion constitute "mixed opinions" and are subject to defamation claims). As the Supreme Court noted, "simply couching statements in terms of opinion does not dispel the[ ] implications [of fact], and the statement ... can cause as much damage to reputation as [factual assertions]." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990). Thus, because "[i]t is for the court, not the jury, to determine as a matter of law whether[a] ... statement is one of fact or ... opinion," *Chaves,* 335 S.E.2d at 102, we conclude as a matter of law that Swengler's statements implied the existence of facts and were, therefore, subject to ITT's claim for defamation.

■ Swengler's second argument also fails. In this argument, Swengler claims that his allegations fall under the qualified privilege which protects "a communication made in good faith, on a subject matter in which the person communicating has an interest, or owes a duty, legal, moral or social, if made to a person having a corresponding interest or duty." *Ellington,* 334 S.E.2d at 853, quoting *Taylor v. Grace,* 166 Va. 138, 184 S.E. 211, 213 (1936). Swengler contends that he had a moral duty to inform the Army of his belief and suspicion that ITT was not an appropriate recipient of defense contracts because he believed that ITT misused public funds and had a credibility problem.

---

**5.** We reject Swengler's argument that "actual malice" is a substantive element of ITT's defamation claim because "ITT is a public figure ... [and] ... the issues raised in the letter were of public concern." Appellant's Answering and Reply Brief at 10. Under Virginia law, "actual malice" is not a substantive element of defamation *per se* when the claim "involv[es] a nonmedia defendant." *Ellington,* 334 S.E.2d at 851. Obviously, Swengler is a non-media defendant.

██ Only the court can determine whether this privilege exists. *Ellington*, 334 S.E.2d at 853, citing *Aylor v. Gibbs*, 143 Va. 644, 129 S.E. 696, 697 (1925). Thus, as a matter of law we reject this argument because any such duty would have arisen during Swengler's employment with ITT. In the present case, however, Swengler waited almost one year after he had been fired before "fulfilling" his "legal, moral or social" duty. Moreover, we doubt that Swengler made these statements in good faith because he admittedly made no effort to investigate the truth of these allegations.

██ In summary, we think that ITT clearly established a claim for defamation *per se*. Thus, only the appropriate measure of damages remains to be litigated. In this regard, we note that Virginia law presumes actual damages under a claim for defamation *per se*, but that a plaintiff must establish that the defendant made the statements with "actual malice" before punitive damages can be recovered. *Ellington*, 334 S.E.2d at 853. Accordingly, we think that the district court should enter judgment in favor of ITT on its claim for defamation and hold a jury trial to determine the appropriate amount of damages.

### IV

For the reasons stated herein, we affirm the directed verdict in favor of ITT, dismissing Swengler's breach of contract claim, but reverse the directed verdict in favor of Swengler, dismissing ITT's defamation claim. In addition, we conclude that, with respect to Swengler's liability for defamation, no factual issue remains to be litigated. Thus, we remand the case to the district court with instructions to enter a judgment in favor of ITT. On remand, the district court need only conduct a jury trial to determine the appropriate amount of damages.[6]

*AFFIRMED IN PART, REVERSED IN PART AND REMANDED.*

---

**6.** We express no opinion on the appropriate      amount of such damages.