## DOMCHICK *v.* GREENBELT CONSUMER SERVICES, INC., ET AL.

[No. 158, October Term, 1951.]

*Decided April 4, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Abraham Chasanow* for appellant.

*Hal C. B. Clagett* and *Jerrold V. Powers,* with whom were *Sasscer, Clagett* and *Powers,* on the brief, for appellees.

MARBURY, C. J., delivered the opinion of the Court.

The facts in this case, as shown by the record, are as follows. Greenbelt Consumer Services, Inc., one of the

defendant-appellees, operates a food store in the town of Greenbelt, Prince George's County, Maryland. The defendant-appellee, Ashelman, is the general manager of the corporation. The plaintiff-appellant, Domchick, was employed in the meat department of the food store. He had been employed by the corporation for nine years. For the first six years, he was a meat-cutter, was then made manager of the meat department, and was later demoted to meat-cutter, which position he was filling on November 7, 1950. On that day, a fellow-employee named Faulconer reported to the manager of the meat department that Domchick had sold a customer half a ham for $1.90, which was much below the proper price. The following day, Ashelman was informed of this accusation, and asked the assistant general manager, Ferguson, to get a written statement from Faulconer, which he did, substantiating his oral report. On November 9, Ferguson called Domchick to his office, discharged him, and gave him a check for his wages up to the time of discharge. Domchick then got an appointment with Ashelman and saw him on November 14. He testified that he told Ashelman he did not do what he was accused of, and wanted a trial before the Board of Directors. Ashelman, in appellant's presence, dictated a memorandum of this conversation to his stenographer, and she mailed duplicates to the directors of the corporation at Ashelman's direction. The pertinent parts of this memorandum were as follows: "* * * I asked Mr. Ferguson to get a written statement from the principal witness involved. This was done, and on Thursday Mr. Ferguson told Mr. Domchick that he was accused of giving away merchandise for less than the regular price and the details. * * * Mr. Ferguson did what I had approved earlier—that we discharge this employee. * * * I am afraid that Pop is going to crusade on the situation. * * *". "Pop" was Domchick's nickname. After this discussion, according to Domchick's testimony, Ashelman called him and said, if he would drop everything, he would pay the two or three weeks wages which

Domchick claimed for vacation or termination pay. Domchick told him he would let him know. Ashelman called him again the next day, and Domchick said he could not accept it. Then the meat supervisor made him the same offer, that he would give him the pay, and he would then resign. Domchick refused this, and, on November 17, wrote to Ashelman requesting reconsideration of his discharge, denying the accusation, asking that the customer to whom he was alleged to have sold a ham, and his wife, be called, and requesting notice in writing of the grounds for his discharge, the latter request being in accordance with the Personnel Policies of the corporation. Ashelman replied, stating that Domchick was, of course, aware of the details involved, and if he cared to have a hearing, to advise him of the name of his, Domchick's, representative, the corporation would then appoint one, and they could get together and appoint the third. Domchick then wrote to the chairman of the Board of Directors, Mr. Bierwagen, stating that he was appealing for a hearing by a three-man committee under the provisions of the Personnel Policies, and naming his representative. He requested that Ashelman be directed to give him notice in writing of the specific grounds upon which he was discharged. Ashelman replied to this on November 25. This letter was dictated to his stenographer and mailed by her to Domchick at the direction of Ashelman. In it he said that in his earlier letter, he had avoided the detailed statement because it might be in Domchick's interest to do so. However, as more details were requested, the letter said:

"You were discharged for misconduct, including the following particulars:

"1. On Tuesday, November 7, 1950, undercharging a customer to whom you sold a half ham.

"2. On various occasions removing from the store premises packages of merchandise without checking out and paying for them.

"In my attempt to investigate the situation, I have uncovered more than enough evidence to back up the charge that it is in the interest of the organization not to have you empolyed any longer. I am sorry that this is the case.

"In my letter of the 21st, I failed to mention that we had reconsidered your dismissal. However, as I told you in our conversation, the evidence did not warrant reversing the original decision. The re-investigation turned up addititional evidence—which I will be glad to discuss with you—which makes the case closed as far as we are concerned."

In the letter, Ashelman named his representative at the hearing, and further said: "We have been extremely careful not to discuss the charges except with persons who were directly concerned, and will be glad to cooperate fully in keeping the arbitration hearing private and confidential." On the same date, two other employees of the corporation stated in writing that they had seen Domchick put items of meat in his clothing or pockets. These statements, as well as the written statement from the other employee who had given the information about the ham, were typed by Ashelman's stenographer from the original copies signed by the three men. Several weeks later, there was a hearing before the Policies committee at which, according to Domchick, the three employees all testified to the facts stated in their written reports. The assistant general manager, Mr. Ferguson, testified that Domchick had been discharged for selling the ham, and the grievance committee reported that the discharge of Domchick, "which may have appeared justified at the time, now, after careful review by this committee, appears to have been questionable on the basis of evidence and conflicting testimony which the committee has now heard." The committee, therefore, recommended that Domchick be reinstated and that he resign his position following

his reinstatement. This recommendation was carried out.

Thereafter, Domchick filed a suit in the Circuit Court for Prince George's County against the corporation, Ashelman, the three fellow-employees who had testified against him, and an additional employee. The suit as to this last employee was voluntarily dismissed at the trial. The suit was a combination of slander, libel and conspiracy, and the allegations as to Ashelman were:

> "The defendant, Samuel F. Ashelman, Jr., while acting within the scope, and in the course, of his employment by defendant corporation, and in furtherance of the business of defendant corporation, falsely and maliciously, spoke and published of the plaintiff the words following, that is to say: 'Mr. Domchick concealed merchandise in his pocket and took it home from the store without paying for it', and, 'Pop concealed meat on his person and left the store without paying for it', and spoke and published of the plaintiff, and wrote and published of the plaintiff in a letter which was sent to the plaintiff, the words following, that is to say: 'On Tuesday, November 7, 1950, undercharging a customer to whom you sold a half ham', and, 'On various occasions removing from the store premises packages of merchandise without checking out and paying for them', * * *",

followed by an innuendo pointing out that these statements and publications meant that Domchick had wilfully conspired to defraud the corporation, and had defrauded it, and had stolen, embezzled, and converted to his own use, the property of the corporation, and was guilty of the crime of stealing, embezzlement, larceny, larceny after trust, and/or other crimes. The conspiracy charge was against all the defendants, that they had conspired to slander, libel, and defame the plaintiff, and cause him to lose his position. The corporation was charged with wrongfully discharging him.

To this declaration, the defendants, and each of them, plead (1) that they did not commit the wrong alleged, and (2) that the alleged defamatory statements are true.

The case was duly tried and at the conclusion of plaintiff's evidence, a motion was made by all of the defendants for a directed verdict in their favor on the ground that the statements written and made were privileged and malice was not inferred, and there was no evidence of any express malice, and, therefore, there was no legally sufficient evidence to entitle the plaintiff to recover against them. This motion was granted as to the corporation and Ashelman, and a judgment was entered as to each of these defendants for costs. It is from these judgments that the appeal comes here.

The evidence shows no conspiracy by Ashelman or the corporation. No action in tort lies for conspiracy to do something unless the acts actually done, if done by one person, would constitute a tort. *Kimball v. Harman*, 34 Md. 407, 409. *Miller v. Preston*, 174 Md. 302, 312, 199 A. 471. Three of the employees, either truthfully or falsely, reported orally, and then confirmed it in writing, that the complainant had committed certain dishonest acts. On November 14, Ashelman, in pursuance of his duty to his employer, had a discussion with the plaintiff and other employees, and dictated a memorandum to the corporation in the presence of the plaintiff. This memorandum shows a reasonable basis for refusing to reinstate the plaintiff, and indicates in no way any sort of a conspiracy to get rid of him, nor does any of the evidence point to such a conclusion.

On the charges of libel and slander, all of the evidence offered by the plaintiff tends to show only that the statements made and the letters and memoranda written were part of the normal and ordinary duties which Ashelman owed, as general manager, to his corporation and its board of directors. They were, therefore, privileged communications, and, in order to establish a case against Ashelman and the corporation, it would ordinarily be

incumbent upon the plaintiff to show express malice. He attempted to do this by his own testimony that Ashelman had demoted him from the managership of the meat department back to meat-cutter, but this testimony shows that as a result of some dissension in the department, Domchick himself had asked for this, and Ashelman had not acceded to it for about five months, but finally had demoted him. There is in evidence, moreover, a letter from Ashelman to him at that time, February 13, 1950, which indicates quite clearly that there was no bad feeling. This letter says: "Dear Pop—We are paying you at the old rate for last week in appreciation for your help and cooperation. Best regards and thanks, Sam."

Appellant also contends malice is shown by the memorandum to the Board of Directors, by Ashelman's attempt to discourage him from a hearing by the Board, by his attempt to "coerce him into dropping the matter", upon payment of two or three weeks wages if he would resign, and by the fact that, after the plaintiff had appealed, Ashelman, for the first time, accused him of having stolen merchandise, in addition to the ham episode. The appellant says these facts show that Ashelman was motivated by malice, spite, and ill will, and a lack of good faith, and that even if they do not show personal spite and ill will, some of them go beyond what the occasion required and constitute evidence of malice. *Fresh v. Cutter*, 73 Md. 87, 20 A. 774, 10 L. R. A. 67. *Jump v. Barnes,* 139 Md. 101, 114 A. 734. He further contends that the dictation of the memorandum and letters to the stenographer took the case out of the privileged class. In support of this contention, he cites the case of *Gambrill v. Schooley*, 93 Md. 48, 48 A. 730, 52 L. R. A. 87, which held that the dictation of a letter to a stenographer was publication, that there was no privilege between the stenographer and her employer, and that such a dictation in that case took the communication out of the privileged class. In that case, however, the defendant dictated a libellous letter to his stenographer and had it mailed to

the plaintiff, and the sole question was whether, under such circumstances, the dictation to the stenographer was a publication of the letter, as, of course, the defendant could not have been liable for a letter written to the plaintiff had not someone else seen it. This court held in that case, that, as the stenographer had no interest in the matter, it was a publication. There was no question of privilege in that case at all, and we would be loath to hold that privileged communications respecting the affairs of a corporation or a business must be written by hand and not dictated, as is the universal custom. Ashelman was using the ordinary facilities of his office, in doing something which came within the duties of his office, and to hold that dictating letters and memoranda about such matters to his stenographer was a publication of them to a person who had no interest in them, and, therefore, they were without the ordinary privilege they would otherwise have had, leads to a conclusion which can only be termed ridiculous.

We find nothing *in the evidence* which indicates any express malice or lack of good faith on the part of Ashelman or the corporation. Whatever may have actuated the three fellow-employees in making the charges, and whether they were true or false, it does not appear that Ashelman or the corporation did more than make a normal investigation, with every consideration given to the appellant, and it is noteworthy that the suggestion made to him by Ashelman that he accept several weeks pay and resign, was the very one which was finally recommended by the Policies committee, and which the appellant accepted. The corporation was, of course, liable for the actions of its general manager in the course of his duty, but it cannot be held liable for the actions of the three fellow-employees in making the written charges. They had no authority, express or implied, to bind the corporation by making such charges, and the corporation is not bound by them. But neither Ashelman nor the corporation can escape the consequences of the plea of justification filed by them.

*Poe's Pleading* and *Practice, Tiffany's Edition,* Vol. 1, Sec. 180, discusses the practice in libel and slander cases, stating that the plaintiff almost invariably contents himself with proving the utterance or publication of the oral or written slander, and then rests until the defense is disclosed. The defendant can make his defense in three different modes. The first is under the general issue plea, and is a denial that he ever uttered or published the alleged slander or libel. There is no defense of that nature in the case before us. The second defense is by repelling the legal presumption of falsehood by proof that the language was true. That defense has to be made by a special plea of justification, which was the second plea filed in the instant case. The third defense is by repelling the legal presumption of malice which arises upon the proof of utterance. This may be made under the general issue plea "by proof that the words were spoken or written at such a time or place, or under such circumstances as to render them privileged." What are privileged communications is discussed in Section 181, and one of the classes is where the publisher acted in the *bona fide* discharge of a private duty, as, for example, a director in a corporation, exposing at a meeting of the company, the supposed misconduct of an employee. The case before us did not reach a point where any defenses were made, because it terminated, as to the appellees, at the conclusion of the plaintiff's case, and we have, therefore, to look at the case as it stood then to see whether the plaintiff's evidence itself showed that the communications charged were privileged. If so, then he must further show that the privilege was abused, and that the defendant was actuated by express malice, or did not act in good faith. "* * * he must, as an indispensable part of his own case, go on and give testimony tending to show that the defendant was actuated by express malice; and if he fails to do so, the defendant can, under our Maryland practice, well ask the court, at the close of the plaintiff's case, to instruct the jury that there is no sufficient evi-

dence to sustain the plaintiff's right of action, * * *".
*Poe, supra,* Sec. 182.

It has long been considered the law of this State that the plea of justification, if not sustained, furnishes proof on the record of continued malice, although none may, in fact, continue to exist. *Rigden v. Wolcott,* 6 G. & J. 413, 419. As was said in *Blumhardt v. Rohr,* 70 Md. 328, 342, 17 A. 266, 270: "Besides, the appellant had by plea asserted the truth of the charge his language imputed; and if untrue, as the jury found it to be, it was a reassertion of the slander, and, connected with other circumstances suggestive of malice, it could be considered as some evidence of malice; or, as Chief Justice Parsons expresses it in *Wolcott v. Hull,* 6 Mass. 514, where the defendant justified, and with proof sought to maintain the charge, 'it is evidence of continuing malice.' " The presumption of legal malice does not arise where the publication is privileged. The jury must in such case find actual or express malice. This, however, can be found from evidence of subsequent publications of the alleged libel, and evidence of such publications is admissible. *McBee v. Fulton,* 47 Md. 403, 427. In *Coffin v. Brown,* 94 Md. 190, 50 A. 567, 55 L. R. A. 732, there was no privilege, but there was a plea of justification, and, at the conclusion of the case, the plaintiff offered a prayer that the jury, in considering the evidence and pleadings, be instructed that an unsustained plea of justification is in the nature of the repetition of the libel and is to be taken as evidence, tending to show express malice in the original publication, and is therefore a matter in aggravation of damages. The court, in discussing this prayer, said that although some courts with high authority take the contrary view, it was of the opinion that such a plea, when not sustained, was evidence of malice, and was an aggravation of the wrong. In so holding, it said: "The public may believe that the original publication was the result of a misunderstanding, or false information, but when the publisher has asserted his readiness to prove his statement,

in a judicial proceedings, many may thereby be led to believe that there was some foundation for it. *This Court has therefore adopted the view that it is evidence of malice."* (Emphasis supplied.) In *Deckleman v. Lake,* 149 Md. 533, 131 A. 762, there was a letter reflecting on the credit of the plaintiff, which the lower court held was a qualified privileged communication, with the burden upon the plaintiff to show malice, and, finding no malice, that court directed a verdict for the defendant at the conclusion of the plaintiff's evidence. There was in that case a plea of justification. This court discussed the evidence, and held that it reflected upon the question of the good faith of the defendant in the use of some of the language found in the letter, and was sufficient to take the case to the jury upon the question of malice. In so holding it also said: "Especially is this true when considered in connection with the plea of justification interposed by the defendant, in which he, in effect, says, 'I wrote the letter and the alleged libelous words found therein are true.'" See also *Bowie v. Evening News Co.,* 151 Md. 285, 288-289, 293, 134 A. 214.

It is true that all of these cases, except *Deckelman v. Lake, supra,* involved situations where the testimony upon both sides had been completed, and the court was concerned with questions of evidence and the correctness of prayers. But they undoubtedly hold, and it is the law of this State, that where a defendant pleads justification, and "assumes the serious burden of proving the truth of the defamatory matter" (*McBee v. Fulton, supra,* 47 Md. 428) by so doing, he reaffirms the statements he has made, and if he fails to prove them, the fact of filing such a plea may be considered by the jury as evidence of actual malice, and as a basis for an aggravation in damages. The pleas in a case are always before a jury, and in this case, the jury already had before it the reaffirmation of the truth of the statements made. It does not matter whether they were privileged or not when they were originally made. The appellees were not obliged to reaffirm them by a formal paper filed in court for the

whole world to see. If they only wanted to show that they had good reason to believe that the statements were true, such evidence was admissible under the general issue plea, as several of the cases above mentioned hold. They went further than this, and, by so doing, they furnished *prima facie* evidence of express malice. The testimony as to the publication, even if privileged, plus the re-publication in the plea, makes but a *prima facie* case of publication with malice. Proof of a publication not shown to be privileged infers malice, and is sufficient to require testimony in rebuttal. It cannot be taken from the jury at the close of plaintiff's evidence. This presumption of malice is rebutted where the plaintiffs own evidence shows that the publication was privileged, and, therefore, in such a case, no testimony is required from defendants, and the case can be taken from the jury at the conclusion of the plaintiff's case. But where the defendant has pleaded justification, he must go further, even though the publication was privileged, and rebut the presumption of malice which he, himself, has raised by the republication in the plea, and the case cannot be taken from the jury. The republication, of course, is not conclusive proof of malice, and if the defendant offers proof of the truth of the statements made, then the question of truth is for the jury to decide. If they decide that the statements were true, then the presumption of malice is rebutted. On the other hand, if they decide the statements were not true, the republication by the plea may be considered by them as showing actual malice, and may be considered by them as an aggravation of damages.

Our conclusion, therefore, is that on the state of the pleadings, and the evidence before it, the trial court should not have directed a verdict for the appellees, but should have permitted the case to proceed against them. The appellees contend that the plea of justification may be withdrawn, and its consequences for all purposes thereby avoided (*American-English Annotated Cases,* 1914 D, Vol. 34, p. 1062, and cases there cited), and that the motion for a directed verdict had this effect

in submitting the case free of the plea. We cannot so consider it. The plea was not withdrawn, it was still in the case when the motion was submitted to the court and granted, and it was before the jury at that time. Whether it could be withdrawn after the jury had been sworn, and what the effect of such a withdrawal would be, we do not decide, nor do we express any opinion as to the possibility of such withdrawal and its effect at some subsequent time, before the case is submitted to another jury. These are matters not before us at this time for decision.

*Judgments reversed with costs and cases
remanded for a new trial.*