# HANRAHAN v. KELLY

[No. 217, September Term, 1972.]

*Decided May 16, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*W. Giles Parker* and *Peter Parker* for appellant.

*William B. Somerville,* with whom were *Douglas G. Worrall* and *Smith, Somerville & Case* on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court. BARNES and SMITH, JJ., dissent and BARNES, J., filed a dissenting opinion in which SMITH, J., concurs at page 39 *infra.*

Appellant Edward M. Hanrahan (Hanrahan) filed suit in the Circuit Court for Baltimore County against W. Boulton Kelly (Kelly) and the architectural firm of Tatar & Kelly, Inc. (Tatar & Kelly), seeking damages for an alleged libel. The charge of libel arose from a letter from Kelly to Hanrahan dated November 18, 1970, which read:

> "MR. HANRAHAN, we are answering your preposterous letter of November 16, 1970, not to dignify but to register our disavowal of its content.
>
> "Your letter, as you well know, is totally a fabrication, devised as an obvious attempt to extort a settlement. It follows a period of harrassment and

threats based upon other apparent fabrications. "Any actions on your part to support your scheme of extortion not only will be vigorously resisted but also will be countered by whatever proceedings may be appropriate to remedy an extreme abuse of judicial process.

Very truly yours,

/s/

For Tatar & Kelly,     W. Boulton Kelly   WBK/vm

cc:  Mr. N. Antonelli
     Mr. R. Goldman
     Mr. P. Moser
     Mr. R. Maher"

The case was heard by a jury, Judge Walter M. Jenifer presiding. At the conclusion of the plaintiff's case, the court directed a verdict in favor of Tatar & Kelly. At the conclusion of the entire case, the trial judge ruled the letter libelous per se, as charging the criminal offense of extortion, and submitted the case to the jury on the issues of qualified or conditional privilege (terms used synonymously herein), malice and damages; the jury returned a verdict in favor of the remaining defendant, Kelly. Judgment was entered in favor of both defendants. Hanrahan appealed, alleging error in specified instructions to the jury and evidentiary rulings of the court. No issue, however, was raised as to the directed verdict for Tatar & Kelly, and, consequently, that matter is not before us on appeal.

At trial, evidence was adduced showing that extortion is a criminal offense in Maryland (Maryland Code (1957, 1971 Repl. Vol.) Article 27, §§ 561, 563); that the letter had been typed by Vivian Mercer, a secretary in the office of Tatar & Kelly, and possibly read by Dorothy Daniels, supervisor of the secretarial staff of Tatar & Kelly; that copies of the letter had been sent to the four persons indicated on the letter; and that copies were also sent to George McManus, Chase Solomon, and Abraham Adler.

The letter alleged to be libelous was mailed against a background of events which centered on a dispute between Hanrahan and Kelly, Seymour Tatar (Tatar), Dominic F. Antonelli (Antonelli) and Kingdon Gould, Jr. (Gould) concerning Hanrahan's asserted interest in the property known as the Park Plaza located in the Mt. Vernon Place section of Baltimore City. Hanrahan had long been connected with the Park Plaza, having handled public relations for two former owners prior to the purchase of the property, in 1966, by Park Plaza Associates, a limited partnership, in which Antonelli and Gould were general partners. Park Plaza Associates leased the property to the Park Plaza Company, a corporation in which the controlling stock was owned by Antonelli and Gould. Hanrahan had been developing promotional ideas for the Park Plaza, specifically a "mansion market concept," and rendered professional assistance in public relations and promotional help to the Park Plaza Company, and subsequently became its president. In the spring of 1968, Hanrahan began occupying the fifth floor "penthouse" of the Park Plaza as his residence and office.

The Park Plaza Company was not successful in its operation and terminated its business on January 2, 1970, at which time the Park Plaza was repossessed by Park Plaza Associates for non-payment of rent.

Hanrahan continued to live in the Park Plaza and continued to develop plans for its use, which he presented to Antonelli and Gould directly and through their attorneys, Ronald L. Maher (Maher) in Baltimore and Mitchell Blankstein (Blankstein), in Washington, D.C. In February 1970, Hanrahan proposed setting up a new development company to manage the Park Plaza; a contract under which Hanrahan would receive a percentage of the rental revenues was drawn up by Maher. This contract was rejected at a meeting with Antonelli on April 16, 1970. As a result of that meeting a new agreement was drawn up, signed by Antonelli and Hanrahan, by which Hanrahan was given what appeared to be an option up to May 15, 1970 for the purchase of the Park Plaza. It was also agreed that

Hanrahan would be permitted to remain as a rent-free resident of the Park Plaza until June 1, 1970. At a meeting on May 9, 1970, the option was extended, in writing, to June 1, 1970 but expired on that date when not exercised by Hanrahan.[1]

Toward the end of May, Hanrahan discussed the Park Plaza with Kelly who was then Chairman of the Historical and Architectural Preservation Commission of Baltimore City. Kelly expressed an interest in the building as his architectural firm, Kelly & Tatar, was relocating its offices. Hanrahan attempted to interest Kelly in his ideas for the Park Plaza and arranged a meeting with Antonelli on June 2, 1970. Antonelli was out of town and Kelly and Hanrahan met with Blankstein.

Tatar and Kelly subsequently began negotiations with Antonelli to purchase the Park Plaza; Hanrahan was not included in Tatar's and Kelly's plans. To assist with their negotiations, Tatar and Kelly employed attorneys Robert M. Goldman (Goldman) and Peter Moser (Moser). In addition, Chase Soloman (Soloman), an accountant, officer, and director of Tatar & Kelly was directed to assist in the matter. Negotiations for the purchase of the Park Plaza commenced in the early part of July 1970, leading to a contract dated August 14, 1970, transferring the Plark Plaza Associates' partnership interests to Kelly and Tatar, individually. The contract had been reviewed by Blankstein and Maher for Antonelli, and Goldman, Moser and Soloman for Kelly and Tatar. It provided, among other things, that the Park Plaza was to be free of tenancies which Kelly and Tatar did not approve, including Hanrahan's. Hanrahan refused to move at Kelly's request; instead, he insisted that he had rights in the Park Plaza. An extended legal battle to evict Hanrahan from the premises then ensued. Hanrahan employed counsel, A. Cookman Boyd and Henry M. Decker, Jr., to represent his interest, but after brief correspondence, they withdrew from the case. Maher initiated eviction proceedings; Hanrahan employed another attorney, George

---

1. Hanrahan testified that the agreement was orally extended. Antonelli denied that it was ever extended beyond June 1.

F. McManus (McManus), who discussed the matter with Moser on November 5, 1970.

On November 16, 1970, Hanrahan, with some advice from McManus, sent a letter to Kelly and Tatar, reiterating his previous claims. It read:

"Dear Bo and Seymour:

"Despite the fact that I approached you, Bo, only for your official capacity to generate municipal support for my enterprise, I did later agree to let you both into *my* deal — as partners with me in Park Plaza ownership and development.

"Eventually, I also agreed to your representing our mutual interests in finalizing the terms and conditions of the purchase contract with Park Plaza Associates.

"Pursuant to our partnership, I did the following:

(1) — Continued to make available to you the three years of my research, analysis and groundwork that you have publicly acknowledged from the basis of this property's development potential and your involvement therewith;

(2) — Devised certain tenant operations, divisions and licensing formulae;

(3) — Produced tenants and negotiated leases — at least one of which is already developing significant property revenue — in fact: five times the square-foot yield from *any* former Park Plaza lease;

(4) — Carried personally the expense of continuing to occupy, repair, maintain and protect the property, and further unearth prospective tenants.

"However, you have breached the partnership trust imposed upon you — by failing so far to furnish me with:

(a) — a copy of the contract of purchase re: 2, 4, 6 West Madison, 810 and 812 N. Charles;

(b) — your written acknowledgement of my interest therein;

(c) — notification of settlement date therefor.

"Consequently, I now demand that you set the record straight by enabling my further active participation, — or buy out my interest at a price commensurate with its fair market value.

"In the event that you fail to comply with this demand, I shall, in addition to other remedies, in due time file a Bill under Article 73A, Section 22 for my right to an accounting to the partnership's affairs.

Very truly yours,

Edward M. Hanrahan"

Copies of this letter were sent the following day by Hanrahan to Antonelli and Maher.

Kelly turned Hanrahan's letter over to Goldman who drafted a response, which was edited by Moser, and sent to Kelly to be typed and mailed. This is the letter of November 18 upon which Hanrahan sued. Copies were sent to Antonelli, Maher, Moser and Goldman, as indicated on the original. Later in the day, copies were sent to McManus and Soloman.

The efforts to evict Hanrahan continued — unsuccessfully. Another attorney, experienced in eviction proceedings, Abraham Adler (Adler), was employed, and received, for preparation of the case, Kelly's file which included a copy of Kelly's November 18 letter. Ultimately, Hanrahan left the Park Plaza in March, 1971.

This brief synopsis of the copious evidence in the record cannot adequately capture the details of involvement of the named recipients of Kelly's letter. Suffice it to say that we have studied the lengthy record extract submitted to us, and are convinced that, by numerous interactions, each of the recipients of that letter was fully aware of the existing dispute.

## I. Conditional Privilege

The finding that the letter was libelous per se is uncontested, and the evidence that copies of Kelly's letter were sent to the seven individuals heretofore named was uncontradicted. The main issues, both below and on appeal, involve the defense of conditional or qualified privilege based on a mutuality of interest between the sender and the recipients. As we noted in *Simon v. Robinson*, 221 Md. 200, 206, 154 A. 2d 911, 915 (1959):

> " . . . the cases concerning interest or duty invariably state or hold that a libelous communication is privileged only when the occasion shows that the communicating party and the recipient have a mutual interest in the subject matter, or some duty with respect thereto."

The defense recognizes that under the conditions delineated in *Simon*, but subject to an infinite variety of factual circumstances, defamatory words are privileged from liability, not absolutely, but on the condition that "the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." Prosser, *Law of Torts* § 110 at 809 (3d. ed. 1964). Another formulation of the privilege, which we previously noted in *Stevenson v. Baltimore Baseball Club, Inc.*, 250 Md. 482, 243 A. 2d 533 (1968), is that of the Restatement of Torts § 596 (1938):

> "An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know."

Comment c to the above section recognizes that the common interest can arise in relation to interests in property, business and professional dealings.[2] For a brief review of our

---

**2.** We have previously recognized that qualified privilege arising by reason of common interest in the subject matter can inhere in business

prior decisions on the issue, *see Simon v. Robinson, supra,* 221 Md. at 206, 154 A. 2d at 915.

Mutual interest in the subject matter is but one type of qualified privilege recognized in the law of defamation. *See Stevenson v. Baltimore Baseball Club, Inc., supra,* 250 Md. at 486, 243 A. 2d at 536. The general rules governing all conditional privileges are, however, well-settled. A finding of conditional privilege conditionally negates the presumption of malice and shifts the burden to the plaintiff to show actual malice. *Peurifoy v. Congressional Motors, Inc.,* 254 Md. 501, 255 A. 2d 332 (1969). Malice may be a jury question. As stated in *Fresh v. Cutter,* 73 Md. 87, 93-94, 20 A. 774, 775 (1890):

> "It is a question for the Court whether the statement if made in good faith and without malice is thus privileged. But the plaintiff has the right notwithstanding the privileged character of the communication to go to the jury, if there be evidence tending to show actual malice, as where the words unreasonably impute crime, or the occasion of their utterance is such as to indicate, by its unnecessary publicity or otherwise, a purpose wrongfully to defame the plaintiff. ... Or, malice may be established by showing that the publication contained matter not relevant to the occasion. ... Expressions in excess of what the occasion warrants do not *per se* take away the privilege, but such excess may be evidence of malice ...."

Absent a finding of express malice, a conditional privilege, if

---

dealings between the publisher and the recipient. See Deckelman v. Lake, 149 Md. 533, 131 A. 762 (1926); Bavington v. Robinson, 124 Md. 85, 91 A. 777 (1914). Other jurisdictions have afforded the privilege to lawyers having a common interest in a dispute by virtue of their representation of one of the disputants. See, *e.g.,* Knight v. Patterson, 20 Utah 2d 242, 436 P. 2d 801 (1968); Rodgers v. Wise, 193 S. C. 5, 7 S.E.2d 517 (1940); *cf.* Spielberg v. A. Kuhn & Bro., 39 Utah 276, 116 P. 1027 (1911), where the common interest of the publisher and the recipient, among other things, the fact that each was being sued by the party allegedly defamed. See also 172 A.L.R. 208, 217-220 ("Communication to agent or representative of person defamed as publication or as privileged.").

not abused, defeats the libel action. *Wetherby v. Retail Credit Co.*, 235 Md. 237, 241, 201 A. 2d 344, 347 (1964).

The lower court found as a matter of law that Moser and Goldman "were legally entitled to receive the . . . letter" written by Kelly, and that ruling is not challenged on appeal. As to the other five persons who received copies, the court instructed the jury:

> "If you find from all of the evidence in the case that the letter in question was privileged under the standards I have hereinbefore set forth, and if you further find that the plaintiff has not persuaded you by a fair preponderance of affirmative evidence that there was actual or express malice on behalf of the defendant in writing said letter, then your verdict should be in favor of the defendant."

Since the court had previously instructed the jury, as a matter of law, that Kelly's letter was libelous per se, it is wholly apparent that only by finding a conditional privilege to exist between Kelly and the recipients of his letter, and the absence of a preponderance of evidence to establish actual malice on Kelly's part, could the jury, under the court's instructions, find in Kelly's favor. Since the jury found in Kelly's favor, and since we presume that in so doing it followed the court's instructions, it is plain that the jury's verdict reflected its conclusion that the communication to the seven persons who received copies of the letter was privileged and without actual malice. *Cf. Simon v. Robinson, supra.*

Appellant does not attack this finding directly. At trial he made no motions for directed verdict or for judgment *n.o.v.* On appeal, he argues, not that the jury's verdict was contrary to the facts and law, but that the court fell into prejudicial and reversible error by reason of its evidentiary rulings and jury instructions. Specifically, Hanrahan claims that the court erred in instructing the jury that:

> "In determining whether or not the defendant, Mr. Kelly, was motivated by malice in the writing of his letter of November 18, 1970, you should consider

that it was a response to a letter of the plaintiff dated November 16, 1970."

Hanrahan maintains that the jury should have been instructed to consider only Kelly's letter of November 18 in determining the question of malice. The law, however, is to the contrary where, as here, the issue of qualified privilege has been properly raised. *See Orrison v. Vance*, 262 Md. 285, 295, 277 A. 2d 573, 578 (1971), holding that all relevant circumstances are admissible in determining the existence of actual malice sufficient to defeat the conditional privilege.

Hanrahan next claims error in the court's instruction in which it defined the term "subject matter," as that term is used in the defense of qualified privilege based upon a "mutual interest in the subject matter," to encompass "Hanrahan's alleged interests as a partner in the Park Plaza venture, his rights in the promotion of the same, and his status as a tenant in the building situate thereon." Considering the complex factual background of the case, we think the court's instruction was entirely proper. In so concluding, we note that the phrase "mutual interest in the subject matter" was given further explanation by the court in its instruction on qualified privilege, *viz.*,

> "Stated in another fashion, a communication is conditionally privileged when the circumstances induce a reasonable belief that the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the general standards of decent conduct."

Much of the court's instruction on the matter of qualified privilege was taken verbatim from our prior cases. *See Simon v. Robinson, supra,* 221 Md. at 206, 154 A. 2d at 915; *Henthorn v. Western Maryland Railway Co.,* 226 Md. 499, 507-508, 174 A. 2d 175, 179 (1961). Reviewing the instructions in their entirety, *Jones v. Federal Paper Board Co., Inc.,* 252 Md. 475, 250 A. 2d 653 (1969), *Kauffman v. Love,* 252 Md. 251, 249 A. 2d 700 (1969), in light of all the evidence, we find that there was a factual question as to the

existence of a qualified privilege for Blankstein, Adler, Solomon, McManus, and Antonelli sufficient to go to the jury, and that the jury was properly instructed.

## II. Publication to Secretaries

Hanrahan next claims that the court erred in instructing the jury that:

> "... as a matter of law ... the fact that the letter was typed by Vivian Mercer, a secretary in the office of Tatar and Kelly, and may have been read by Dorothy Daniels, another secretary in said office prior to the mailing thereof does not constitute a publication of said letter and does not sustain liability on the part of the defendant, Mr. Kelly, so far as those two secretaries are concerned."

Hanrahan argues with much force that such instruction is contrary to our holding in *Gambrill v. Schooley*, 93 Md. 48, 48 A. 730 (1901) and not within the exception to the *Gambrill* rule subsequently recognized in *Domchick v. Greenbelt Consumer Services, Inc.*, 200 Md. 36, 87 A. 2d 831 (1952), and *Peurifoy v. Congressional Motors, Inc.*, *supra.*

In *Gambrill* we held that the transcription and typing of a libelous letter by the defendant's private secretary constituted a publication (publication being defined, we there found, as " 'the communication of the defamatory words to some third person' "), and that such publication was actionable — *i.e.*, sufficient to support a finding of libel even if the writing was, as in that case, then delivered to the plaintiff without being made known to any other person. In so holding we rejected the arguments there advanced: (1) that the secretary was performing a mechanical process without perception of the communication; and (2) that in view of the confidential nature of the secretary's employment, and the almost universal use of such services, a sufficiently strong policy reason existed for creating an exception to the rule of publication. In rejecting the policy plea, we said, 93 Md. at 61, 48 A. at 731:

"Neither the prevalence of any business customs or methods, nor the pressure of business which compels resort to stenographic assistance, *can make that legal which is illegal, nor make that innocent which would otherwise be actionable.*" (Emphasis added.)

*Gambrill,* a case of first impression in the United States, reviewed the English cases on point, two of which are here pertinent. *Pullman v. Walter Hill & Co.,* [1891] 1 Q.B. 529, held actionable the publication of a libelous letter to the clerk who transcribed and typed it, and to the office boy who copied it in a letter-press book. In *Boxsius v. Goblet Freres,* [1894] 1 Q.B. 843, the English court recognized an exception to the rule of *Pullman v. Walter Hill & Co., supra. Gambrill* summarized and distinguished *Boxsius,* 93 Md. at 62-63, 48 A. at 732:

"There, the libellous letter was dictated by a solicitor, acting in behalf of and at the direction of his client, and copies were made as in the case mentioned. The Court distinguished the case very clearly from *Pullman v. Hill,* holding, through two of the same judges, that the solicitor owed to his client the *duty* to act on his instructions, and that if the solicitor had communicated directly with the plaintiff, the communication would have been *privileged,* and that he could discharge that duty, as he did other business of the office, in the ordinary way without losing the privilege. But there was no question of privilege in *Pullman v. Hill,* and there is none here, as the appellant owed no duty in the matter to any one." (Emphasis added.)

Thus, in *Gambrill,* we declined to view *Boxsius* as a weakening of the general rule declared in *Pullman,* but classed it instead as a clearly distinguishable exception rooted in the well-established rules of privilege. The general rule in England, established in *Pullman,* became the general rule in Maryland, declared in *Gambrill.*

Fifty years later, the *Boxsius*-type exception was

presented to us in concrete form in *Domchick v. Greenbelt Consumer Services, Inc., supra.* In *Domchick,* the appellant (an employee discharged for theft) alleged libel based on writings by the general manager — a memorandum to the Board of Directors pertaining to appellant's discharge and a letter to him stating the reasons therefor — both of which were typed by the general manager's secretary. We recognized that each of these writings arose out of a duty which the general manager owed to the corporation and its board of directors, 200 Md. at 42, 87 A. 2d at 834; and further, that the letter was the result of a duty which the general manager owed to appellant, the latter having requested "notice in writing of the grounds for his discharge, . . . [this] request being in accordance with the Personnel Policies of the Corporation." 200 Md. at 39, 87 A. 2d at 833. Because of the duty the general manager owed in connection with the writings, we held the communications conditionally privileged. Just as the English courts had recognized that the existence of a privilege in *Boxsius* created an exception to the *Pullman* rule, we recognized that the conditional privilege in *Domchick* created an exception to the *Gambrill* rule. We said:

"... [Appellant] further contends that the dictation of the memorandum and letters to the stenographer took the case out of the privileged class. In support of this contention, he cites the case of *Gambrill v. Schooley,* 93 Md. 48, 48 A. 730, 52 L.R.A. 87, which held that the dictation of a letter to a stenographer was publication, that there was no privilege between the stenographer and her employer, and that such a dictation in that case took the communication out of the privileged class. In that case, however, the defendant dictated a libellous letter to his stenographer and had it mailed to the plaintiff, and the sole question was whether, under such circumstances, the dictation to the stenographer was a publication of the letter, as, of course, the defendant could not have been liable for a letter written to the plaintiff had not someone

else seen it. This court held in that case, that, as the stenographer had no interest in the matter, it was a publication. *There was no question of privilege in that case at all,* and we would be loath to hold that privileged communications respecting the affairs of a corporation or a business must be written by hand and not dictated, as is the universal custom. . . . [The general manager] was using the ordinary facilities of his office, in doing something which came within the *duties* of his office, and *to hold that dictating letters and memoranda about such matters to his stenographer was a publication of them to a person who had no interest in them, and, therefore, they were without the ordinary privilege they would otherwise have had, leads to a conclusion which can only be termed ridiculous."* 200 Md. at 43-44, 87 A. 2d at 835. (Emphasis added.)

*Peurifoy v. Congressional Motors, Inc., supra,* involved a communication factually similar to the letter in *Domchick.* The secretary to the vice-president of Congressional Motors, at the latter's direction, typed the allegedly libelous letter detailing the reasons for Peurifoy's discharge, and the letter was then hand-delivered to Peurifoy, without being communicated to any other person. When *Peurifoy* was decided seventeen years after *Domchick,* it had become well established in Maryland that communications arising out of the employer-employee relationship enjoy a qualified privilege, whether it be classified as a privilege arising from duty (legal or moral), common interest in the subject matter of the communication, or as a sui generis privilege. *See Stevenson v. Baltimore Baseball Club, Inc., supra,* 250 Md. at 486, 243 A. 2d at 536. Therefore, Peurifoy's discharge letter from his employer, typed by the employer's secretary, was immune from liability absent a showing of express malice. The occasion of the communication was privileged, and the essence of our holding in *Peurifoy* reiterated the *Boxsius* rule we recognized, as dicta, in *Gambrill,* namely that "the . . . [defendant] owed . . . the duty, and . . . if the . . . [defendant] had communicated directly with the plaintiff, the

36

communication would have been privileged, and . . . he could discharge that duty, as he did other business of the office, in the ordinary way without losing the privilege." *Gambrill v. Schooley, supra*, 93 Md. at 62-63, 48 A. at 732.

We recognize that some confusion, reflected in the instruction in the instant case, may have been engendered by the flat statement in *Peurifoy* that "there was *no publication* . . . by the dictation of the letter . . . to . . . [the] stenographer and by her transcription of the letter." 254 Md. at 514, 255 A. 2d at 339. (Emphasis added.) We think that a fair reading of *Peurifoy*, particularly its heavy reliance on *Domchick*, which distinguished *Gambrill*, makes it readily evident that we concluded that there had been *no actionable publication* in the circumstances of that case. Our holding in *Peurifoy* does not represent a departure from the general rule of *Gambrill*; rather, it follows the *Domchick* exception to *Gambrill*, *i.e.*, that while such communication is a publication, it is not an actionable publication where an unabused qualified privilege exists.[3]

Relating the governing law to the instructions before us, (that communication to the two secretaries "does not constitute a publication of said letter and does not sustain liability on the part of the defendant, Mr. Kelly, so far as those two secretaries are concerned") we do not find reversible error. While the statement that the communication was not as a matter of law a publication is technically in conflict with the law of Maryland as we reaffirm it today, we think such error, in light of the overall correctness of the instruction that such communication does not sustain liability on the part of the defendant (or, as we

---

**3.** There exists a split of authority on communication of libelous matter to a secretary, some courts holding no publication, others holding publication except in the situation of a privileged communication. 50 Am. Jur. 2d ("Libel and Slander") § 167, 668-69, 53 C.J.S. ("Libel and Slander") § 81, 131; *compare*, 2 S.Car. L.Q. 290 (1950) *with* 27 So. Cal. L. Rev. 229 (1954). We consider the latter the better-reasoned accommodation between competing policies: the protection of the individual from unwarranted defamation; and the policy, behind all defamation privileges, captured by Judge McWilliams with characteristic directness "[t]hat some words need saying." *Orrison v. Vance, supra*, 262 Md. at 292, 277 A. 2d at 576. *See* Prosser, *supra.* § 108 at 786 n. 71.

have expressed it elsewhere in this opinion, "is not actionable"), is harmless. *Baltimore Transit Co. v. State ex rel. Castranda,* 194 Md. 421, 71 A. 2d 442 (1950), *Sieland v. Gallo,* 194 Md. 282, 71 A. 2d 45 (1950); *cf. State Roads Commission v. Kuenne,* 240 Md. 232, 213 A. 2d 567 (1965); *Rippon v. Mercantile-Safe Deposit and Trust Co.,* 213 Md. 215, 131 A. 2d 695 (1957).

To support the substantial correctness of the instruction, we need only look to the court's finding, as a matter of law, of the existence of a qualified privilege as to Moser and Goldman. Where a conditional privilege is so found to exist,

> "Any reasonable and appropriate method of publication may be adopted which fits the purpose of protecting the particular interest. The dictation of a business letter to a stenographer . . . [citing *Domchick* among others] may be privileged on a proper occasion. . . .
>
> "In all such cases, the fact that the communication is incidentally read or overheard by a person to whom there is no privilege to publish it will not result in liability, if the method adopted is a reasonable and appropriate one under the circumstances." Prosser, *supra,* at 820.

There was no evidence that the procedure used for sending the letter was not reasonable; on the contrary, all the evidence was that the typing by Mercer, under the supervision of Daniels, was in accordance with the normal procedure of that office for mailing copies of correspondence. The fact of the publication to the other five persons, and of possible malice, would not deprive Kelly of the immunity, as to the single act of publication to the secretaries, furnished by the qualified privilege as to Goldman and Moser.

### III. Admission of Evidence

Hanrahan claims that the lower court committed prejudicial error in refusing to admit into evidence dictionary definitions (The Oxford Dictionary of the English

Language, 1893 and Webster's unabridged dictionary) and "current newspaper articles and other publications" (among them, the comic strip "Little Orphan Annie") illustrating the meaning of the word "extortion." As this evidence was proffered for the purpose of proving that Kelly used the word in a libelous context — a conclusion confirmed by the lower court when it instructed the jury that the letter was libelous per se — appellant was not injured by the court's ruling.

Secondly, Hanrahan objects to the court's refusal to admit Kelly's *complete* financial statement in evidence. All portions of this document were read into evidence except (a) the value of a residence held by Kelly and his wife by the entireties, and (b) the net worth figure (which included the value of Kelly's residence). We think the court was correct in its ruling excluding consideration of entireties property. *See Lake v. Callis*, 202 Md. 581, 588, 97 A. 2d 316, 319 (1953). If the proffer of the two excepted items were directed to the issue of punitive damages, the objection is rendered moot by reason of the jury's verdict for Kelly. Of if, as appellant contended on oral argument, the proffer of the two excepted items were directed to the issue of Kelly's credibility, and intended for comparison with the financial statement Kelly prepared for this case, we think the portions read into evidence amply fulfilled that purpose.

Lastly, Hanrahan claims that "[t]he court erred in allowing the Defendant and his lawyers to testify as to what they, or any of them, meant by the use of the words in the letter of November 18th, even though the Court ruled that the words were 'libelous per se.'" The short answer to this contention is that Kelly did not so testify, and his lawyers, Goldman and Moser, testified without objection. Lacking objection, the question is not before us on appeal. Maryland Rules 522 (d) (2), 885.

In view of our conclusion, it is unnecessary for us to consider Hanrahan's contentions on the question of damages.

*Judgment affirmed; appellant to pay costs.*

*Barnes, J., dissenting:*

I dissent because, in my opinion, the lower court erred in instructing the jury *as a matter of law* that the possible reading of the libelous letter by Dorothy Daniels did not constitute a publication of that letter by the defendant Kelly, which would sustain liability on his part, such publication being within the qualified privilege, rather than to leave that issue to the jury under proper instructions. Counsel for the plaintiff Hanrahan duly excepted to this error in the lower court's charge and this error was, in my opinion, a prejudicial one. This is the principal and most obvious error, but I am also of the opinion that there were other errors in the lower court's charge which would require a reversal and a new trial.

I agree with the analysis by the majority of the prior decisions of this Court in *Gambrill v. Schooley*, 93 Md. 48, 48 A. 730 (1901); *Domchick v. Greenbelt Consumer Services, Inc.*, 200 Md. 36, 87 A. 2d 831 (1952); and *Peurifoy v. Congressional Motors, Inc.*, 254 Md. 501, 255 A. 2d 332 (1969). The distinction between *Gambrill*, on the one hand, and *Domchick* and *Peurifoy*, on the other, so far as the secretary, Vivian Mercer, is concerned, is properly made, *i.e.*, that in *Gambrill* there was no conditional privilege involved whereas in *Domchick* and *Peurifoy* a conditional privilege was involved.

The majority has also properly observed that there was no intended departure in *Peurifoy* from the rule in this regard announced in *Domchick*. The language in *Peurifoy* that there was *no publication* by the dictation of the letter to the stenographer meant that there was no *actionable publication*. This proper interpretation of that language in *Peurifoy* is supported by the language in the preceding paragraph in *Peurifoy* where it is stated:

"The appellant contended in his brief and in the argument before us that there was a 'publication' of the alleged libel by dictation of the letter . . . to his secretary . . . ."

254 Md. at 513, 255 A. 2d at 338.

The placing of the word "publication" in quotation marks indicates that this word was used in the sense of actionable publication and not in its technical sense in the law of libel. It is also interesting to note that in the Atlantic Reporter — 255 A. 2d 332, where *Peurifoy* is reported, Key Number 25 "Libel and Slander" correctly indicates that the dictation of the letter to the stenographer "*did not constitute publication of letter for purposes of establishing libel,* considering that letter was privileged." (Emphasis added), thus correctly interpreting the language in question.

The law is well established that the charging of a crime for which there may be indictment and punishment is libelous *per se* and imports malice, requiring a directed verdict for the plaintiff for at least nominal damages, *unless,* of course, the charge of the crime is contained in a communication which is within the scope of a qualified and unabused privilege. *Fennell v. G.A.C. Finance Corp.,* 242 Md. 209, 218, 218 A. 2d 492, 496 (1966); *Richardson v. State,* 66 Md. 205, 214 (1886); and *Negley v. Farrow,* 60 Md. 158, 178 (1883).

In *Richardson v. State, supra,* Judge Irving, for the Court, stated:

> "An evil intent is a conclusive inference and presumption of law from the publication of the libelous matter without excuse," citing *Negley v. Farrow, supra,* with approval, where Judge Robinson, for the Court, stated:

> "The article being *per se libellous,* and its publication being established, the only question before the jury, was the amount of damages, which, under all the circumstances, the plaintiff was entitled to recover."

It is equally well established that when a qualified privilege is asserted by the defendant as a defense, the publication of the libelous writing to one not within the scope of the qualified privilege, that privilege is lost and the ordinary rules in regard to libel *per se* apply. *Love v. Commercial Cas. Ins. Co.,* 26 F. Supp. 481 (S.D. Miss. 1939);

*Teare v. Local Union No. 295*, 98 So. 2d 79 (Fla. 1957); *Gardner v. Standard Oil Co.*, 179 Miss. 176, 175 So. 203 (1937); *Montgomery Ward & Co. v. Nance*, 165 Va. 363, 182 S. E. 264 (1935); 53 C.J.S. *Libel and Slander* § 109 at 187-88 (1948).

In my opinion, the lower court properly instructed the jury that the letter of November 18, 1970, was libelous *per se* and that the stenographer, Vivian Mercer, who typed the letter of November 18, 1970, was within the qualified privilege as a matter of law. The lower court erred, however, in *also* instructing the jury that the fact that Dorothy Daniels, who was in charge of secretarial personnel of Tatar & Kelly, Inc., and may have read the libelous letter, was not an actionable publication by the defendant *as a matter of law*.[1] The majority states:

> "There was no evidence that the procedure used for sending the letter was not reasonable; on the contrary, all the evidence was that the typing by Mercer and under the supervision of Daniels was in

---

1. The lower court's instruction on this point was as follows:

"...as a matter of law ... the fact that the letter was typed by Vivian Mercer, a secretary in the office of Tatar and Kelly, and may have been read by Dorothy Daniels, another secretary in said office prior to the mailing thereof, does not constitute a publication of said letter ... and does not sustain liability on the part of the defendant Mr. Kelly, so far as those two secretaries are concerned."

Counsel for the plaintiff Hanrahan duly excepted to this portion of the charge:

"... we disagree with your Honor's conclusions that the dictation to Vivian Mercer and having been read by Dorothy Daniels and further keeping in the files at Kelly's office and subject to being read by anybody who happens to look at it, that these things laid on the desk in his office which he said. I think that all of those things together, dictation to the secretary and reading by the office manager to complete publication of the libel in this case. Mr. Kelly testified, if your Honor pleases, flatly and very definitely that for Dorothy Daniels in this matter had no mutual interest and that she was aware of the contents of this libelous letter, and now there the defendant himself has admitted no mutuality of interest, and if this is no mutuality of interest, there is no privilege .... For those reasons we except to that portion of your Honor's charge."

accordance with the normal procedure of that office for mailing copies of correspondence."

My examination of the record extract does not disclose any evidence indicating that Mrs. Daniels participated in the typing or mailing of the letter of November 18, 1970, involved in the present case. She was not produced as a witness by the defendant Kelly. Vivian Mercer's testimony rather indicates that she herself typed and mailed the letter and the copies as well. She stated, on cross-examination by counsel for the defendant:

"Q. Now, I note it [the unmarked copy of the letter of November 18, without underlining, Plaintiff's Exhibit No. 11] says registered mail, return receipt requested. A. Uh-huh.

"Q. . . . Was the letter sent out by registered mail? A. As far as — as to my knowledge it was."

\* \* \*

"Q. Now, isn't it true that you would only send — you only sent copies of the letter to people whose names appeared either blind copies or regular copies? A. Right. No one else would receive them."

Indeed, the defendant in his brief does not contend to the contrary, stating:

"The letter was typed by Vivian Mercer ('Mercer'), Kelly's secretary and mailed to Hanrahan both by ordinary mail and registered mail."

It would be unlikely that Mrs. Daniels, in charge of secretarial personnel, would attend to the mailing of letters, but far more likely that this task would be done by the secretary, Miss Mercer, as she testified.

The testimony of the defendant Kelly, in my opinion, was sufficient, in itself, to take the case to the jury on this point. He stated:

"Q. In answers to Interrogatories we filed in this case you mentioned persons having knowledge of

this matter other than the persons who got carbon copies of this letter included a Vivian Mercer and Mrs. Dorothy Daniels. *Did Dorothy Daniels know about this letter and see copies of it before it went out? A. I can't say, but I presume she did.*

"Q. Under affidavit you answered my Interrogatories and said she was one of the persons who did know about the letter? A. *She would have to know about it. She is in charge of all secretarial personnel.*

"Q. In your answers to Interrogatories and answer to question as to what others knew about the contents of this letter or had seen the same in addition to those listed for receiving carbon copies you named Vivian Mercer, and you named an address and Dorothy Daniels. Now, was that true at the time they had— A. *She is in charge of all of the secretarial personnel assignment of this thing. She probably did know about it.*

"Q. She probably did? A. Yes.

"Q. *Did she have any mutual interest in the subject matter of this letter with you particularly, particular interest in her own mutual interest in the subject matter of this letter? A. Not that I can identify."*

(Emphasis added)

Surely, this testimony that the defendant "presume[d] she did," "know about this letter and see copies of it," "would have to know about it," and "probably did know about it," with reasonable inferences, would justify a jury in concluding that she *did* know about and *did see* copies of it. If she did, there was a publication and the statement of the defendant himself, that he could not identify any mutual interest she might have in the subject matter, is sufficient to justify a conclusion by the jury that she in fact had no mutual interest in the subject matter. These conclusions would eliminate the qualified privilege and would entitle the plaintiff to a verdict for at least nominal compensatory

44

damages and, indeed, for substantial compensatory and possible punitive damages, bearing in mind that the trial court instructed the jury that the letter of November 18, 1970, was libelous *per se* as charging the commission by the plaintiff of the crime of extortion. This error was, therefore, quite prejudicial to the plaintiff and, in my opinion, requires a reversal and a new trial.

The burden of proof was upon the defendant Kelly to establish the qualified privilege by a fair preponderance of affirmative evidence, *see Coleman v. Newark Morning Ledger Co.*, 29 N.J. 357, 373, 149 A. 2d 193, 201 (1959); *Neigel v. Seaboard Finance Co.*, 68 N. J. Super. 542, 549, 173 A. 2d 300, 304 (1961); Prosser, *Torts* § 115 at 796 (4th Ed. 1971); 50 Am. Jur. 2d *Libel & Slander* § 451 at 974 (1970); 53 C.J.S. *Libel & Slander* § 220 a at 332 (1948). *Cf. Vojack v. Jensen*, 161 N.W.2d 100, 108 (Iowa 1968). The lower court properly so instructed the jury. The defendant should have had that burden of proof to establish that Mrs. Daniels, either did not read the libelous letter, or, if she read it, had some mutual interest in the subject matter which would include her within the qualified privilege. In regard to the question of her "mutual interest," the lower court might well have directed the verdict on this point in favor of the plaintiff in view of Mrs. Kelly's testimony, already quoted. In any event, it was *at least* a jury question.

The closest case factually to the present case is *Montgomery Ward & Co. v. Nance, supra,* where the slanderous statement of a store manager in discharging an employee was made in the presence of a payroll clerk of the company who had no interest in the matter. The Supreme Court of Appeals of Virginia stated:

> ". . . it is well settled that the employer has no right to use the words in the presence of a third person who has no interest in the matter and whose duties, though also an employee, do not bring the third person into the transaction."

165 Va. at 379, 182 S. E. at 270.

There are, in my opinion, other errors in the charge of the

lower court which also should result in a reversal and a new trial in the present case.

First of all, the lower court erred in confining the plaintiff to proof of express or actual malice to overcome the qualified privilege if the jury found one to exist. It is well established that the protection of the qualified privilege may *also* be lost by an *abuse* of the qualified privilege. The privilege must be exercised in a "reasonable manner and for a reasonable purpose." Prosser, *Torts* § 115 at 792 (4th Ed. 1971). *See Brush-Moore Newspapers, Inc. v. Pollitt,* 220 Md. 132, 138, 151 A. 2d 530, 533 (1959); *Rayco Mfg. Co. v. Dunn,* 234 F. Supp. 593, 601 (N.D. Ill. E.D. 1964). *See also Montgomery Ward & Co. v. Nance, supra; Montgomery Ward & Co. v. Watson,* 55 F. 2d 184 (4th Cir. 1932); Newell, *Slander & Libel* § 343 at 382 and § 392 at 417 (4th Ed. 1924); 53 C.J.S. *Libel and Slander* § 97 at 154 and § 109 at 187 (1948).

In my opinion, the jury, under proper instructions, could well have concluded that the charge of extortion was excessive, unnecessary to protect any interest of the defendant and an abuse of the qualified privilege. It should be remembered that in Hanrahan's letter of November 16, 1970, he set out the alleged basis of the partnership, what he had done to promote its interest and the alleged breaches of the partnership trust by Kelly. He demanded either the right to participate actively in the partnership affairs or that his interest be purchased "at a price commensurate with its fair value." He further stated that if his demand was not complied with, he would file a bill in equity under Maryland Code, Article 73A, § 22 for an accounting of the partnership affairs. He made no threat of any illegal action or indeed a demand for any specific amount, but only for the fair value of his partnership share if Kelly wished to discontinue the partnership. The charge of extortion in the reply letter of November 18 may well be found to be excessive and not to further any legitimate business interest of Kelly. It is not like the situation involving an employee who steals or embezzles — those crimes being germane to the business interest involved. The situation in the instant case is more like that involved in the English case of *Senide*

*v. Medland*, 4 Ju. (NS) 1039, involving a charge at a vestry meeting by the plaintiff, an incoming vestryman, that the defendant, an outgoing vestryman, had neglected the interests of the vestry and had not collected the rates, to which the defendant replied that the plaintiff had been bribed by a railway company. The Court held that the alleged bribing by the railway company was not connected with the plaintiff's charges and was not privileged, being not in self-defense but in counter-attack.

It is my opinion that counsel for the plaintiff sufficiently excepted to the charge on this ground, thus preserving it for appellate review. It was pointed out to the lower court that there was no evidence that Kelly "was under any legal duty to anybody to accuse Mr. Hanrahan of extortion" and further that none of the things mentioned in the letter of November 16 had "anything to do with the subject matter of the libelous letter accusing him of extortion." Nor was this point abandoned on appeal, the appellant stating in his brief that there was nothing in the previous business relationships between Hanrahan and Kelly which "would have justified the language used in the letter of November 18, 1970, which the Court has properly ruled as a libel per se." The appellant's brief further stated that ". . . such words, even if privileged, cannot exceed the exigency of the occasion."

Finally, I am of the opinion that it could well be found by the jury that the sending of the libelous letter to Adler, some two months after its original publication, in view of his subsequent employment only to evict Hanrahan from the premises, was an abuse of the conditional privilege. The jury should have had special instructions in regard to his situation rather than to have him included in a general statement applicable to the original recipients of copies of the libelous letter of November 18. The charge of extortion could have been of no assistance or relevance to Mr. Adler's legal work in ejecting Mr. Hanrahan from the premises; the Hanrahan letter of November 16, 1970, was relevant to this matter inasmuch as it set out Hanrahan's position, but a simple statement by Kelly that his position was that

Hanrahan's position was not well founded would have been entirely sufficient and not a republication by Kelly of the charge of extortion by sending Adler a copy of the libelous letter of November 18. *See Pulvermann v. A. S. Abell Co.*, 228 F. 2d 797, 802 (4th Cir. 1956) where the United States Court of Appeals for the Fourth Circuit, in a case involving Maryland law, stated:

> "The rule in Maryland is that repetition of false statements is not privileged [citing *Negley v. Farrow, supra,* and *Richardson v. State, supra.*"]

Here again, in my opinion, plaintiff's counsel preserved this point for appellant review, having excepted to the lower court's instructions by stating, *inter alia,* that he did not believe that "all recipients of Kelly's letter of November 18th had a mutual interest in the subject matter of the plaintiff's letter of November 16th" and further that Hanrahan's "status as tenant in the building was a matter between him and Park Plaza Associates, not connected with Kelly in any way, shape or form and nothing to do with the circumstances surrounding the writing of the libelous letter . . . ." Although not developed specifically in his brief, the appellant's general discussion of "mutual interest in the subject matter" is sufficient, in my opinion, to indicate that the point was not abandoned by the appellant.

For all of these reasons, I am of the opinion that the judgment should be reversed and the case should be remanded for a new trial.

I am authorized to state that Judge Smith agrees with the views expressed in this dissenting opinion.